**David V. RIDER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 94–CF–1587.

District of Columbia Court of Appeals.

Argued Sept. 26, 1996.

Decided Dec. 30, 1996.

Francis T. Lacey, Rockville, MD, appointed by the court, for appellant.

Angela Schmidt, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Eva Polin, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN and SCHWELB, Associate Judges.

STEADMAN, Associate Judge:

 Appellant David Rider was convicted of first-degree premeditated murder while armed for the beating to death of Kenneth Love, his acknowledged "sugar daddy," in the latter's apartment in the Kennedy–Warren complex at 3133 Connecticut Ave., N.W., in the early hours of December 19, 1992.[1] After finding as an aggravating circumstance that the murder was "especially heinous, atrocious, and cruel," the trial court sentenced appellant to life imprisonment without possibility of parole in accordance with D.C.Code § 22–2404.1.

---

1. Rider was also convicted of second-degree murder while armed and first-degree theft. The government concedes that the lesser murder conviction must be vacated, and we remand solely for that purpose. Rider cannot remain convicted of both first-degree premeditated murder and second-degree murder of the same victim. *Thacker v. United States,* 599 A.2d 52, 63 (D.C. 1991). The trial court quite correctly imposed sentences on both convictions and permitted them to stand pending appellate review. *Catlett v. United States,* 545 A.2d 1202, 1219 (D.C.1988).

The principal issues on appeal relate to Rider's challenges to the imposition of this maximum sentence.[2] He contends that the trial court erred 1) in failing to set forth the reasons supporting its finding that this aggravating circumstance applied to this murder, and 2) in making such a finding within the meaning of the statutory language where the victim was not tortured or otherwise subjected to extreme pain. He also contends that the statutory notice of the government's intent to seek such a sentence was inadequate because it was served only on his attorney and not on Rider personally. We affirm.

## I.

In December of 1992, appellant Rider was unemployed and lived with his friend Dawn Marshall in the 2100 block of Florida Avenue. The two were facing financial troubles, and according to Marshall were selling drugs and engaging in prostitution in order to pay the rent and support their cocaine habits. On several occasions, Rider discussed with Marshall the possibility of killing and robbing one of his "sugar daddies." One such conversation occurred about two weeks prior to the murder.

Sometime after 2 a.m. on December 19, 1992, Rider visited the apartment of Kenneth Love, an affluent man whom he had known for about a year. The two men had previously met on a regular basis at Love's apartment. On these occasions, Love provided Rider with cash in exchange for sex. The two had also frequently socialized in public. According to Rider, his "sugar daddy" would occasionally treat him to expensive dinners at restaurants in Georgetown and Chevy Chase. Love also took him to the department stores at Mazza Gallerie, where he would purchase cologne, cosmetics, and clothes for Rider.

It is unclear precisely what transpired in the apartment upon Rider's arrival on this particular occasion.[3] At some point, however, Rider smashed Love on the side of the head with a fifty pound concrete decorative ornament. The blow was so powerful that it fractured Love's skull from ear to ear along the base, and inflicted numerous other fractures extending from the orbital plates above the eyes down to the jaw. According to the medical examiner, Dr. Carol McMahon, the resulting bone fragments of the skull and face resembled "eggshells." The victim's brain suffered fracture lacerations involving the right frontal lobe and the right parietal lobe. Although it is uncertain whether Love ever regained consciousness, according to Dr. McMahon the blow to the skull ultimately proved fatal.

After striking Love, Rider retreated into the kitchen. There he procured a serrated knife in order to ensure Love's death. Returning to his victim, Rider remembered "slashing his testicles and slashing his ankles so he wouldn't get up and come get me."[4] Rider sliced open the victim's scrotum, so

---

**2.** Rider's other arguments may be addressed summarily. For the first time on appeal, he takes issue with certain instructions, which we therefore review only for plain error. *Allen v. United States,* 495 A.2d 1145, 1151 (D.C.1985) (en banc). Contrary to appellant's assertion, the instruction on premeditation required the jury to find that premeditation occurred prior to the fatal act. The instruction suggesting that voluntary intoxication could constitute a defense to second-degree murder as well as first-degree was, if anything, beneficial to Rider; in any event, the jury in convicting on first-degree murder necessarily rejected his voluntary intoxication defense. *See Swann v. United States,* 648 A.2d 928, 934 (D.C.1994). The instruction on theft as a lesser included offense of the armed robbery charge was given at the express behest of Rider; he can hardly be heard now to complain of the trial court's action. *See Jackson v. United States,* 650 A.2d 659, 663 (D.C.1994) (holding appellant bound by position taken by trial counsel). Finally, the evidence presented in this case was sufficient to support the requisite jury finding of premeditation and rejection of voluntary intoxication defense. See Part I *infra.*

**3.** Rider told inconsistent accounts of the events leading up to the murder. That morning he told Dawn Marshall that Love had passed out before he killed him. He later told police that he killed Love in a struggle after Love had tried to force him to perform fellatio.

**4.** These statements were made during a January 5, 1993, video-taped confession, subsequently played before the jury. Rider also testified at trial. The defense theory was that there had

that, when found, his testicle was hanging out. He recalled, "I slashed him, then I cut his ankles so he'd bleed. I didn't want him— I didn't want him to, like, not die . . . [I]t looked like he was suffering." According to Rider's own testimony, he could hear Love breathing and making gurgling noises as he disfigured the man's genitalia.

After killing Love, Rider rummaged through the apartment, and, as he testified, "just started grabbing things," including money, jewelry, and clothing. He found and took the keys to the victim's car, which he loaded up with the stolen goods. Upon returning to his apartment, Rider told Marshall what had transpired. The two unloaded the items from the car, including numerous bags, shirts, ties, shoes, suits and toiletry items; a jewelry box containing watches, calling cards, and keys; a portable television, and several bottles of assorted liquors and wines.

After unloading the car, Rider told Marshall that he was "going to get rid of the car." He wiped the car clean of fingerprints and abandoned it in a nearby parking lot. When he returned, the two went upstairs and drank a bottle of champagne and a bottle of wine recently acquired from Love to celebrate their newfound wealth. Appellant gave Marshall a Tiffany watch belonging to Love, which she accepted. The following evening, Rider and several friends took a trip to a nightclub in New York City. Rider wore a suit that he had taken from Love. He also gave away a bottle of perfume and a designer checkbook to his friends, boasting of having "gooked" his "sugar daddy."

Police discovered the body on December 21. Love was naked, lying face up, with his body half on and half off a couch in the bedroom. A shirt was draped over Love's head, and a bloody, serrated knife wrapped inside a cloth napkin was lying at his elbow. The backs of both of Love's ankles were cut, and small pools of blood had collected on the floor underneath his ankles. Love's scrotum . also was cut and his right testicle was hang-

ing out and had become dry as a result of air exposure. Upon removing the shirt from Love's head, police found a bloody, fifty pound concrete pineapple ornament crushing his head.

Love's apartment was otherwise in order, and there were no signs of a struggle. Given the absence of any defensive wounds on the victim's hands or body, Dr. McMahon testified that the victim was more likely than not asleep or otherwise unconscious when the fatal blow to the head was applied. The stab wounds to the victim's ankles had not severed any major blood vessels, but based on the bleeding, Dr. McMahon concluded that the victim's heart was still beating when these cuts were inflicted.

On March 18, 1993, a five-count indictment was filed charging Rider with separate counts of first-degree burglary with intent to steal and to assault, armed robbery, and separate counts of first-degree murder while armed for felony and premeditated murder. On January 14, 1994, the government filed notice that it would seek a sentence of life imprisonment without possibility of parole should Rider be convicted of first-degree murder. Rider was tried before a jury from July 14 until July 21, 1994. He was convicted of premeditated first-degree murder while armed, and the lesser included charges of second-degree murder while armed and first-degree theft.

After determining that the murder was "especially heinous, atrocious, and cruel," the trial court sentenced appellant to life imprisonment without possibility of parole on the charge of premeditated first-degree murder, with concurrent terms of fifteen years to life and nine years on the second-degree murder and theft convictions, respectively.

## II.

The principal and novel issues presented in Rider's appeal revolve around the application of D.C.Code § 22–2404.1, a recent enactment

been no premeditation, reducing the crime to second-degree murder, or alternatively that Rider used excessive force in self-defense, reducing the crime to manslaughter.

which we have had occasion to review on only one prior occasion.[5] That provision was adopted by the D.C. Council in 1992 and authorizes imprisonment for life without possibility of parole in certain cases of first-degree murder.[6]

## A.

■ At the conclusion of the sentencing proceedings, the trial court made a simple written finding of fact stating that "[t]his court finds beyond a reasonable doubt that the murder committed by the defendant, David V. Rider, was especially heinous, atrocious, and cruel." For the first time on appeal, appellant contends that this written factual finding was insufficient to comply with section 22–2404.1. He asserts that the statute requires the trial court to set forth in writing not only which aggravating circumstance it found to exist, but also the reasons supporting its determination. No objection was made below, nor was any request made

for a written statement of reasons in support of the court's determination. In such circumstances, we are quite satisfied that the trial court committed no reversible error.[7]

■ We begin, as always, with an examination of the statutory language itself. D.C.Code § 22–2404.1(c) provides that "[t]he court shall state in writing *whether*, beyond a reasonable doubt, one or more aggravating circumstances exist." (Emphasis added). In examining statutory language, "the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc); *Tesfamariam v. District of Columbia Dept. of Consumer and Regulatory Affairs*, 645 A.2d 1105, 1108 (D.C.1994). Plainly, the statute requires the trial court to make a written finding that one of the statutory aggravating circumstances does in fact exist before life

---

**5.** *See Henderson v. United States*, 678 A.2d 20 (D.C.1996).

**6.** The statute, as originally enacted, read in full as follows:

(a) If a defendant is convicted of first-degree murder, and if the prosecution has given the notice required under § 22–2404(a), a separate sentencing procedure shall be conducted as soon as practicable after the trial has been completed to determine whether to impose a sentence of life imprisonment or life imprisonment without possibility of parole.

(b) In determining the sentence, the court shall consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

(1) The murder was committed in the course of kidnaping or abduction, or an attempt to kidnap or abduct;.

(2) The murder was committed for hire;

(3) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

(4) The murder was especially heinous, atrocious, or cruel;

(5) The murder was a drive-by or random shooting;

(6) There was more than 1 offense of murder in the first degree arising out of 1 incident;

(7) The murder was committed because of the victim's race, color, religion, national origin, or sexual orientation;

(8) The murder was committed while committing or attempting to commit a robbery, arson, rape, or sexual offense;

(9) The murder was committed because the victim was or had been a witness in any criminal investigation or judicial proceeding, or the victim was capable of providing or had provided assistance in any criminal investigation or judicial proceeding;

(10) The murder victim was especially vulnerable due to age or a mental or physical infirmity;

(c) The court shall state in writing whether, beyond a reasonable doubt, one or more of the aggravating circumstances exist. If the court finds that one or more aggravating circumstances exist, a sentence of life imprisonment without parole may be imposed.

(d) If the trial court is reversed on appeal because of error only in the separate sentencing procedure, any new proceeding before the trial court shall pertain only to the issue of sentencing.

D.C.Code § 22–2404.1 (1992). This provision was subsequently amended in 1995 to add two additional aggravating circumstances.

**7.** We have no occasion here to address a situation where a trial court is specifically asked to expand upon its reasons for finding that a particular aggravating factor exists.

imprisonment without possibility of parole may be imposed. However, nothing in this language requires the court to detail for the record the process by which it comes to the conclusion that such a circumstance exists. The word "whether," ordinarily used to introduce alternatives, is not to be confused with the word "why," which asks for what reason.[8] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 2603, 2612 (1981).

Rider argues that the writing requirement makes no sense if it can be satisfied by merely "parroting" the language of the statute. This, he says, would provide no meaningful guidance to the appellate court in determining whether the trial court's finding was properly supported by the evidence. But appellate courts routinely make sufficiency determinations in jury cases, where no explanation at all is provided. Here, the trial court is required to focus upon a listing of aggravating circumstances and designate specifically which one or more of them it finds to exist. There is nothing in the legislative history of the statute that suggests

that the provision should be more expansively read.[9]

We deal here with a sentencing provision, where the discretion of a trial judge is of maximum range.[10] In *Veney v. United States,* 681 A.2d 428 (D.C.1996) (en banc), we were called upon to address the application of a statutory provision which required that a trial court "find that [a] youth offender will not derive benefit from treatment under [the Youth Rehabilitation Act]" before the youth could be sentenced as an adult.[11] We held that the statute imposed no additional requirement of a statement setting forth the reasons for a trial judge's finding of "no benefit." In so holding, we followed the reasoning of *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). In that case, the Supreme Court recognized that the statute requiring a finding of no benefit at the time of sentencing did not, without more, mandate that the finding be accompanied by supporting reasons. *Id.* at 441–42, 94 S.Ct. at 3051–52.[12]

---

**8.** Indeed, read literally, the statute does not even require the court to say which aggravating circumstance it is relying on. We think, however, the trial court quite correctly read the statute as intending that the writing identify the particular aggravating circumstance or circumstances that the trial court found to exist.

**9.** In fact, the legislative history of the statute indicates that the Council did not intend by this provision to limit the trial judge's discretion in sentencing, but rather to augment it by authorizing a sentence that the judge previously could not impose. The Council rejected the suggestion that judges be forced to consider mitigating circumstances or that juries make the determination because where such requirements are imposed, as in the death penalty context, "it has become almost routine that the sentencing procedure is much more time consuming, expensive and onerous." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 9–118, at 3 (March 18, 1992). Under the statute, even when an aggravating circumstance is found to exist, the imposition of life without possibility of parole is permissive rather than mandatory. "Thus, the court retains its discretion to consider any mitigating factors when it imposes sentence." *Id.*

**10.** We have long recognized that the trial court has broad discretion in matters of sentencing.

*Powers v. United States,* 588 A.2d 1166, 1169 (D.C.1991); *McPhaul v. United States,* 452 A.2d 371, 374 (D.C.1982); *Butler v. United States,* 379 A.2d 948, 950 (D.C.1977). Appellate review of sentencing is extremely limited, and this court ordinarily will not set aside a sentence that is within the limits set by statute. *Williams v. United States,* 571 A.2d 212, 214 (D.C.1990); *Jones v. United States,* 401 A.2d 473, 476 (D.C. 1979).

**11.** D.C.Code § 24–803(d).

**12.** In *Dorszynski, supra,* the Supreme Court declined to infer an intention on the part of the legislature to restrict the sentencing judge's traditional discretion, noting that the fact that Congress failed to explicitly require that a written pre-sentencing "finding" be supported by reasons "strengthens our view that it intended no new appellate encumbrance upon the sentencing process." *Id.* at 442 n. 15, 94 S.Ct. at 3052 n. 15. In this case, as in *Dorszynski,* there is no evidence that the D.C. Council intended to impose any extensive additional obligation on trial judges in the sentencing context. *See* note 9, *supra.*

■ So here too we conclude that, at least absent a request,[13] section 22–2404.1(c) does not require the trial court to detail for the record the reasons for its finding that the aggravating circumstance existed.

### B.

■ The next issue is whether the trial court could properly find beyond a reasonable doubt that Rider's crime was "especially heinous, atrocious, or cruel" ("EHAC") within the meaning of the statute. Rider maintains that as a matter of law, the phrase EHAC must be construed to include only those murders committed in a manner involving torture or the infliction of extreme pain to the victim. The government concedes that this murder would not qualify under such a construction; its own expert testified that the victim was probably asleep or unconscious when the fatal blow fell. Rather, the government argues that the statutory language should not be so narrowly construed.

In our only prior consideration of section 22–2404.1, *Henderson v. United States, supra* note 5, we affirmed, substantially on the basis of the trial court's opinion, the imposition of a sentence of life without possibility of parole where the trial court found that the murder was especially heinous, atrocious, or cruel. (The court also found that the victim was especially vulnerable due to age.) In

that case, the trial court looked for guidance to the federal death penalty statute, which permits the imposition of the death penalty for certain murders where "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim." 21 U.S.C. § 848(n)(12). Applying that test, the trial court found that since the victim was stabbed and strangled while alive, the test had been met. There was no occasion, therefore, to reach the issue now before us. In that regard, however, the trial court itself noted that the provision in our statute is broader than its federal counterpart. In particular, our provision contains no language limiting its focus to the "manner" in which the murder was committed or to its impact upon the victim.[14]

Rider suggests that we look to cases from other jurisdictions which have interpreted such general language. He points to the death penalty statutes of several states where similar language has been read narrowly.[15] However, the government contends, and we agree, that these cases address a situation different from that presented here. Those limiting constructions were judicially imposed as a result of a Supreme Court holding that phrases such as "especially heinous, atrocious or cruel" were unconstitutionally vague in violation of the Eighth Amendment because on their face they failed to

---

13. *See* note 7, *supra.*

14. Several aggravating circumstances contained in our statute are described in language similar to those in the federal counterpart. For example, 21 U.S.C. § 848(n)(9) makes it an aggravating factor that "[t]he victim was particularly vulnerable due to old age, youth, or infirmity," while the D.C.Code § 22–2404.1(b)(10) equivalent is that "[t]he murder victim was especially vulnerable due to age or a physical or mental infirmity." The omission of the federal language relating to torture or serious physical abuse from D.C.Code § 22–2404.1(b)(4) was apparently deliberate. See the discussion of legislative history, *infra.*

15. Courts in several states have judicially limited the application of the terms "especially heinous, atrocious, or cruel" to murders involving torture or serious physical abuse. *See Perry v. State*, 893 P.2d 521, 533 (Okla.Crim.App.1995) ("To sup-

port a finding that a defendant committed murder in an especially heinous, atrocious or cruel manner, the State must show the murder was preceded by torture or physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty."); *Nuckols v. State*, 805 P.2d 672, 674 (Okla.Crim.App.1991) (requiring a two step analysis, in which the jury must make a threshold finding of torture or physical abuse before it may proceed to consider whether the murder was EHAC); *Ex parte Kyzer*, 399 So.2d 330, 334 (Ala.1981) (holding that the aggravating circumstance EHAC "was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."); *Smalley v. State*, 546 So.2d 720, 722 (Fla.1989) (same limitation); *State v. Ross*, 230 Conn. 183, 646 A.2d 1318, 1361–62 (1994) (construing "EHAC" to require a showing of the infliction of extreme pain, suffering or torture on the victim).

provide sentencing juries in capital cases with sufficient guidance in determining when the death penalty may be imposed. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Such language, it was held, could pass constitutional muster only when so construed as to limit and guide the discretion of the sentencer. *Id.* at 362, 108 S.Ct. at 1858. In *Maynard*, the Court found acceptable a limiting construction of the "EHAC" aggravating circumstance to cases involving torture or serious physical abuse. *Id.* at 365, 108 S.Ct. at 1859–60; *accord, Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990).

Appellant does not suggest that a limiting construction of section 22–2404.1 is constitutionally required. We therefore employ the familiar canon that the words of the statute are to be accorded the meaning commonly attributed to them, *Peoples Drug Stores, supra,* 470 A.2d at 753, and we see no reason to doubt that the Council intended to use the words "especially heinous, atrocious, or cruel" in their ordinary sense. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED (1981) defines "heinous" as "hatefully or shockingly evil: grossly bad; enormously and flagrantly criminal." *Id.* at 1050. "Atrocious" is defined as "marked by or given to extreme wickedness, brutality, or cruelty: grossly inhumane; outrageous, violating the bounds of common decency; utterly revolting, or abominable." *Id.* at 139. "Cruel" is defined as "disposed to inflict pain esp. in a wanton, insensate, or vindictive manner: pleased by hurting others: sadistic." *Id.* at 546.[16]

These definitions do not focus exclusively upon the sensations of the victim before death. They speak also to the murderer's state of mind and to society's view of the murder as compared with other murders. Moreover, the legislative history of the statute reveals that the D.C. Council intended to cover a broader range of murders than just those involving torture. In its discussion of the background and need for the statute, the Committee on the Judiciary noted several examples of what it considered the "more heinous types of murder." Included are:

> execution murders where the victim is tied and gagged before [being] killed; parents who are out with their families [and] are gunned down; and random shootings and killings "just for the fun of it." One especially heinous crime involved a victim and her child where the murderer after beating them to death, remained in their home with the bodies eating their food and selling off their furniture and property a piece at a time. Because of these types of crimes, a new look at the District's penalties for first degree murder is in order.

REPORT ON BILL 9–118, *supra* note 9, at 2. These examples do not focus upon the pain and suffering of the murder victim, but instead upon the senselessness of the crimes and the callousness of the perpetrators. Rider's position is supported by neither the language nor the legislative history of the statute. We therefore conclude that the application of section 22–2404.1(b)(4) is not limited to instances where the victim is tortured or suffers extreme physical pain.[17]

Applying the statutory provision to the case before us, we think that, consistent with

---

**16.** It is true that the provision also contains the word "especially." We think this word was added, in the main, from an understandable belief that all homicides satisfying the requisites of first-degree murder might be considered heinous, atrocious, or cruel.

**17.** Our approach follows that of the State of Illinois in interpreting a similar statute in the non-death penalty context. The relevant Illinois statute permits the imposition of a natural life imprisonment sentence where, *inter alia,* the murder is "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruel-

ty." Ill.Rev.Stat.1989, ch. 38, par. 1005–8–1(a)(1). The Illinois courts have refused to construe this aggravating circumstance as limited to cases involving torture or unnecessary pain to the victim. *People v. La Pointe*, 88 Ill.2d 482, 59 Ill.Dec. 59, 68, 431 N.E.2d 344, 353 (1981) (finding that the callous attitude and lack of remorse evinced by defendant's wearing of a T-shirt with the words "Elmhurst Executioner" appearing thereon is sufficient). Rather, in evaluating the brutality and heinousness of the crime, the entire spectrum of facts surrounding the given incident is taken into account. *People v. Hartzol*, 222

the trial court's traditionally broad discretion in matters of sentencing, see note 10, *supra*, wide latitude should be given to the trial court in determining whether the murder in question falls within this statutory provision. Indeed, Rider does not even argue that, if the statute is given a reading more expansive than the narrow view he advocates, this particular murder could not be characterized as "EHAC." Given the totality of the circumstances of this offense as set forth above in some detail, we see no basis for upsetting the trial court's finding.

### C.

 Appellant contends that he was not properly put on notice that the government would be seeking a sentence of life without possibility of parole. Section 22–2404(a) provides that "[t]he prosecution shall notify the defendant in writing at least 30 days prior to trial that it intends to seek a sentence of life imprisonment without parole as provided in § 22–2404.1." Such notice was filed with the Superior Court and mailed as well as faxed to defendant's counsel on January 14, 1994.[18] Appellant claims that this was insufficient and argues that the statute requires personal service upon the defendant.

It is, of course, the standard rule in both civil and criminal litigation that once counsel has been brought into the case, service is to be made not upon the party but rather upon the party's attorney, as the agent of the party.[19] We see no reason to think that the Council, in enacting this statute, intended that a different procedure be followed for this particular phase of a litigation proceeding. Where the legislature intends that litigation-related service be made personally, it knows how to so provide. *See, e.g.,* D.C.Code § 23–562 (requiring that an arrest warrant·

and summons "be served upon a person by delivering a copy to him personally"); D.C.Code § 11–2503 (requiring in disciplinary proceedings that the service of charges "shall be served upon the member personally."). The use in section 22–2404 of the term "notify" rather than "serve" further indicates that the section was not intended to establish such formal procedures as to encompass the unusual requirement of personal service. It would be odd indeed for the legislature to impose such a requirement when ethical rules place significant limitations on direct contacts between the prosecutor and a represented defendant. *See* D.C. Rules of Professional Conduct 4.2 and comment 8.

We remand this case to the trial court with directions to vacate the second-degree murder conviction. See note 1, *supra*. In all other respects, the convictions are

*Affirmed.*

Ill.App.3d 631, 165 Ill.Dec. 112, 127, 584 N.E.2d 291, 306 (1 Dist.1991).

18. The notice was served on Stephen Russell, Esq., who withdrew as appellant's counsel on April 12, 1994, and was replaced the next day by Glennon Threatt, Esq. Appellant's new counsel acknowledged during colloquy before trial that

"I'm aware of that notice, Your Honor, and I've discussed it with my client."

19. Super. Ct.Crim. R. 49(b); Super. Ct. Civ. R. 5(b). These provisions by their terms apply only to service required by the rules themselves or court order.