*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 98-CF-1088, 98-CF-1425 and 04-CO-1503

COLIE L. LONG, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(Fel-2346-96)

(Hon. Nan R. Shuker, Trial Judge)

(Argued April 24, 2013                        Decided October 24, 2013)

(Amended January 23, 2014)[1]

*Sydney J. Hoffmann* for appellant.

*Suzanne C. Nyland*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Roy W. McLeese III*, Assistant United States Attorney at the time the motion was filed, for the appellee.

---

[1]    After initial publication of this opinion, counsel for appellant, Ms. Hoffmann, filed a motion asking that the opinion be amended in such fashion that it would not suggest that her representation of appellant had been ineffective. Public Defender Service moved to file a brief as amicus curiae in support of counsel's motion. We grant both motions and have amended the opinion for that purpose by adding footnote 12, and modifying some of the language in Part I of the opinion.

Before GLICKMAN, *Associate Judge*, and BELSON and SCHWELB, *Senior Judges*.

BELSON, *Senior Judge*: Appellant, Colie L. Long, asks this court to recall the mandate it issued in 2006 after the resolution of his direct appeal in *Long v. United States*, 910 A.2d 298 (D.C. 2006) (*Long I*) and to reconsider our holding in that case. After evaluating appellant's claims, we grant the motion, reconsider our earlier decision, vacate appellant's sentences but not his convictions, and remand for resentencing.

An abridged recitation of the history of this case is necessary to understand the conclusion we reach here.[2] On March 19, 1996, appellant "shot and killed fourteen-year-old Ronald Williamson." *Long I*, 910 A.2d at 301. A grand jury indicted appellant for first-degree premeditated murder and related charges. At

_____

[2] A more detailed account of the facts can be found in *Long I*, 910 A.2d 298, in which this panel of the court affirmed appellant's convictions but remanded for a hearing on his motion filed pursuant to D.C. Code § 23-110 (2001), and *Long v. United States*, 36 A.3d 363 (D.C. 2012) (*Long II*), in which this court affirmed the denial of appellant's D.C. Code § 23-110 motion. The dissenting opinion in *Long II* sets forth especially detailed information about the background and facts of the case. 36 A.3d 363, 380-96 (D.C. 2012). It points out, *inter alia*, that at Long's first trial, the jury was unable to agree upon a verdict on the murder charge; that prior to that trial appellant Long had rejected a plea bargain that called for a substantially lighter sentence (a maximum exposure of 100 months imprisonment, according to appellant's counsel, in stark contrast to the life without possibility of parole ("LWOP") sentence he is serving); and that certain exculpatory information admitted at his first trial was not offered at his second trial, at which he was convicted of first degree premeditated murder, and sentenced to LWOP.

appellant's first trial, which took place in March 1998, the jury convicted him only of "carrying a pistol without a license, and a mistrial was declared on the other charges." *Id.* at 303. The government obtained a superseding indictment, and appellant's second trial began on June 22, 1998. *Id.* At this trial, appellant was convicted of first-degree premeditated murder while armed,[3] conspiracy to commit murder,[4] assault with a dangerous weapon,[5] and possession of a firearm during a crime of violence.[6] *Id.* at 301. After a subsequent hearing, the trial court issued an order on September 30, 1998, sentencing appellant to life in prison without parole ("LWOP"). Following the procedure required at that time by D.C. Code § 22-2404, the trial judge found, beyond a reasonable doubt, that three of the aggravating factors listed in D.C. Code § 22-2404.1[7] existed in this case: "(1) that the murder was especially heinous, atrocious or cruel; (2) that the murder victim was especially vulnerable due to age; [and] (3) the murder was committed after

---

[3] D.C. Code §§ 22-2401, -3202 (1989).

[4] D.C. Code § 22-105 (a) (1989).

[5] D.C. Code § 22-502 (1989).

[6] D.C. Code § 22-3204 (b) (1989).

[7] Now set forth at D.C. Code § 22-2104 (2012 Repl.).

substantial planning."[8] Appellant filed a timely notice of appeal. He subsequently filed a motion to vacate his conviction pursuant to D.C. Code § 23-110 (2001) on grounds of ineffective assistance of trial counsel, the denial of which appellant also appealed.

Litigation over appellant's D.C. Code § 23-110 motion delayed this court's resolution of his direct appeal until 2006. During that time, the Supreme Court issued a series of decisions, including *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), that expanded constitutional protections for defendants at sentencing. This court quickly recognized in other cases that, in light of the Supreme Court's decisions, a defendant is entitled to trial by jury regarding the aggravating factors that can make a defendant eligible for a sentence of LWOP. In a series of cases, beginning with *Keels v. United States*, 785 A.2d 672 (D.C. 2001), this court applied plain-error review to sentences of LWOP imposed prior to the issuance of *Apprendi*. Upon finding plain error, this court reversed and remanded several cases for re-

---

[8] In reaching these conclusions, the trial court explained that it had considered "the evidence presented at trial; the presentence report; a letter sent by the defendant's godmother; and the government's memorandum in aid of sentencing." The trial court also considered appellant's confession, which had been suppressed prior to the first trial. *See Long I*, 910 A.2d at 302.

sentencing. *See id.* at 687, *see also Robinson v. United States,* 890 A.2d 674, 685 n. 19 (D.C. 2006) (*Robinson I*); *Dockery v. United States*, 853 A.2d 687, 691 (D.C. 2004).

Appellant himself took note of the applicability of the *Apprendi* line of cases to his own situation. In April 2001, he wrote to his attorney on direct appeal, Richard Stolker, suggesting that "due to *Apprendi v. New Jersey* my sentencing to life in prison without parole is not right (or shall we say unconstitutional). Simply because the enhancement papers (which were the reasons for my life without parole sentence in accordance with § 22-2404.1), were not brought before a grand jury and that all of the aggravating circumstances (especially while attempting to commit a robbery) were never substantially proven."[9] But counsel did not take any steps to raise appellant's *Apprendi* issue. Three years later, on July 16, 2004, appellant filed a *pro se* Rule 35 (a) motion to correct his sentence, citing both *Apprendi* and *Blakely*. Appellant argued that, at his sentencing hearing, "the government presented 4 aggravating factors to the court, which warranted the imposed sentence of life imprisonment without the possibility of parole. The jury

---

[9] Although the government initially noticed before trial that it would seek life without parole on the grounds that appellant had committed the murder while attempting to commit a robbery, it did not proceed on that theory after trial and the trial court did not rely on that factor in reaching its sentencing decision.

which deliberated my case held no knowledge of these aggravating factors." On August 9, 2004, Appellant's Rule 35 motion was denied by the trial court in an order that did not cite *Keels*, which this court had decided in 2001. The trial court sent notice of its denial to appellant's counsel on direct appeal. No appeal from that order was noticed.

On May 5, 2005, after appellant's D.C. Code § 23-110 motion was denied without a hearing, Mr. Stolker filed a brief on appellant's behalf in this court. The brief cited neither *Apprendi* nor *Keels*. Nonetheless, counsel did obtain some relief for appellant, as this court remanded for a hearing on the D.C. Code § 23-110 motion. *Long I*, 910 A.2d at 310-11. On remand, Mr. Stolker was replaced as appellant's attorney by Thomas Heslep, on February 2, 2007. Mr. Heslep eventually filed a "Renewed Motion for Correction of Sentence" in April 2008. Referring back to appellant's initial *pro se* filing in 2004, Mr. Heslep cited *Apprendi*, *Blakely*, *Keels*, and another LWOP case, *Robinson v. United States*, 946 A.2d 334 (D.C. 2008) (*Robinson II*). In Mr. Heslep's motion, he noted that "Mr. Long's appellate counsel did not raise this issue . . . , although he should have done so. Nevertheless Mr. Long raised it during the pendency of his appeal." In its opposition to Mr. Heslep's motion, filed on June 24, 2008, the government pointed

out that any claim of deficient representation by appellant's counsel on direct appeal could be litigated in this court only through a motion to recall the mandate.

Following further procedural steps not pertinent here, *see Long II*, 36 A.3d at 377-78, the trial court denied Mr. Heslep's motion as procedurally barred. In 2012, a divided panel of this court affirmed, holding that Mr. Heslep's motion was procedurally barred by appellant's failure to appeal the denial of his *pro se* motion in 2004 but, more important, concluding also that *Apprendi* did not apply retroactively to collateral attacks because it was neither "a substantive rule nor a watershed rule of criminal procedure." *Id.* at 379. This court did note, however, that appellant could have pursued his *Apprendi* claim on direct appeal, "as the appellant did in *Keels v. United States*." *Id.* at 379 n.12 (citation omitted).

After the trial court's decision in *Long II*, appellant's third post-conviction counsel, Sydney Hoffmann was appointed on January 7, 2009. She filed on March 28, 2012, the motion to recall the mandate currently at issue. The motion requests that this court recall the mandate issued after *Long I* because appellant was deprived of effective assistance of counsel on his direct appeal when his then counsel failed to present this court with appellant's *Apprendi* claim. However, as the government points out, appellant's motion was filed well after the expiration of

the 180-day period established for such motions by D.C. App. R. 41 (f).[10] Accordingly, before evaluating the motion on the merits, our first task is to determine whether we can and should consider this untimely motion.

### I. *Rule 26 (b) and "Good Cause"*

Anticipating the government's objection, appellant has also requested that this court exercise its power under D.C. App. R. 26 (b) and "extend the time prescribed by these rules to" file his motion.[11] This court may grant such an extension only upon a showing of "good cause." In his motion, appellant argues that his own prompt and timely efforts to have his *Apprendi* issue adjudicated on the merits, despite his and his attorneys' failure to identify the proper procedural mechanism, support a finding of "good cause." The government responds that since appellant and his attorneys clearly knew of his *Apprendi* claim for years before this motion was filed, appellant must advance a more adequate excuse for the prolonged failure to move to recall the mandate. However, it is clear to us that

---

[10] The mandate in *Long I* issued on December 1, 2006.

[11] D.C. App. R. 26 (b) allows the court to either "extend the time prescribed by these rules to perform any act" or "permit an act to be done after that time expires." In whichever of those two categories appellant's motion falls, he is required to show "good cause."

the delay in the filing of appellant's motion to recall the mandate has been due to the failure of counsel to do what was necessary to protect appellant's rights under *Apprendi*.

That appellant has not received, overall, effective representation by his first two post-conviction counsel regarding his *Apprendi* claim cannot be seriously disputed. The failure of appellant's original counsel on direct appeal to make an *Apprendi* argument on that appeal after appellant had requested in writing that he do so fell below the standards for effective representation articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. He also failed to move to recall the mandate on the ground that he should have advanced appellant's *Apprendi* claim on direct appeal. This failure is understandable because attorneys generally cannot be expected to argue their own ineffectiveness. *See Hardy v. United States*, 988 A.2d 950, 960 (D.C. 2010). However, Mr. Heslep, who succeeded as appellant's original counsel while the 180-day window to recall the mandate was still open, was free to argue the ineffectiveness of previous counsel. Mr. Heslep's motion of April 15, 2008, renewing appellant's 2004 *pro se* Rule 35 (a) challenge, demonstrates that he understood appellant's *Apprendi* claim, was familiar with this court's case law indicating that the claim of ineffective assistance would have succeeded had it been raised, and recognized that previous counsel

ought to have raised the claim on direct appeal. He did not, however, file a motion to recall mandate within the 180-day period, as required by the rule. Mr. Heslep later had the benefit of the government's response to his motion, which correctly identified the proper procedural remedy for ineffective appellate counsel: a motion to recall the mandate. Clearly, after that response, counsel ought to have filed a motion to recall mandate.

We therefore confront this question: do appellant's extraordinary personal efforts to assert his *Apprendi* claim constitute good cause sufficient to warrant the granting of the requested lengthy extension of time under Rule 26 (b)? Initially, we note that this court has not yet rendered an opinion explaining what constitutes "good cause" in the context of our Rule 26 (b). However, we have interpreted a variety of rules that require a showing of "good cause," or its cousin, "excusable neglect," to forgive a party's delay in acting. *See, e.g.*, *Restaurant Equip. & Supply Depot v. Gutierrez*, 852 A.2d 951 (D.C. 2004) (discussing "good cause" in Super. Ct. Civ. R. 55 (c)); *Mizrahi v. Schwarzmann,* 741 A.2d 399 (D.C. 1999) ("good cause" in Super. Ct. Civ. R. 16 (b)(6), 26 (e), (g)); *Wagshal v. Rigler*, 711 A.2d 112 (D.C. 1998) (discussing "good cause" in Super. Ct. R. Civ. 41 (b)); *Lynch v. Meridian Hill Studio Apts.*, 491 A.2d 515 (D.C. 1985) (analyzing what constitutes "excusable neglect" under Super. Ct. Civ. R. 60 (b)(1)); *Railway Exp.*

*Agency, Inc. v. Hill*, 250 A.2d 923 (D.C. 1969) (same). We also have the benefit of several cases from the United States Courts of Appeals, some of which we cite below, interpreting the "good cause" standard of Federal Rule of Appellate Procedure 26 (b), which is similar to our own. Accordingly, we look to the concepts articulated in those cases when determining what standard to apply in analyzing Rule 26 (b).

"Although we have not squarely defined 'good cause,' our cases establish that good cause is to be determined 'in the light of the circumstances of each case.'" *Restaurant Equip.*, 852 A.2d at 956 (citation omitted). "In making that determination, this court has always found the moving party's reasons for failing" to comply with the applicable rule "to be a key consideration." *Id.* at 956-57. In general, mere "inattendance to office chores and good faith mistakes are not sufficient to show good cause." *Mollura v. Miller*, 621 F.2d 334, 335 (9th Cir. 1980); *see also Restaurant Equip.*, 852 A.2d at 956-57 (no "good cause" where party claimed it "inadvertently 'forgot' to file" answer). It is especially significant here that our cases also require consideration of the prejudice that would result to either party from the grant or denial of the extension, and a "balanc[ing of the] efficiency of the court system" with "our preference for decisions" on the merits. *Mizrahi*, 741 A.2d at 404.

Generally, an attorney's mistake of law or lack of "due diligence" will not excuse a failure to comply with court rules. *See Lynch*, 491 A.2d at 518. However, this court has granted relief in exceptional cases where an attorney's conduct was so plainly contrary to "his express instructions or his implicit duty to devote reasonable efforts in representing his client, provided that the client himself is diligent in pursuing the claim." *Id.* at 519 (internal quotation marks and citation omitted). We think such an exception is most appropriate in this case. Appellant brought his *Apprendi* claim to the attention of his counsel on direct appeal over a decade ago, and has attempted to litigate it, with and without the assistance of counsel, ever since. *See Citizens Bldg. & Loan Ass'n of Montgomery Cnty. v. Shepard*, 289 A.2d 620, 623 (D.C. 1972) (affirming grant of relief, despite delay of over four years, where "appellees' express instructions (to file an answer) were ignored" and where defaulting parties "'used reasonable and extreme diligence' in attempting to protect their rights"). We conclude that in two instances appellant's attorneys acted in violation of either their "express instructions" or their "implicit duty to devote reasonable efforts" to appellant's representation.[12] Appellant

---

[12] The conclusion that appellant's counsel acted in violation of either their "express instructions" or their "implicit duty to devote reasonable efforts" to appellant's representation was based upon the entirety of the representation he received from his first two post-conviction counsel. Specifically, Mr. Stolker,

(continued . . .)

himself, on the other hand, made extraordinary efforts to obtain a resolution of his *Apprendi* claim, even writing his counsel on direct appeal advising him of the applicability of *Apprendi*, and filing his own motion for relief on that ground. Accordingly, we conclude that appellant has shown good reason for his failure to move to recall the mandate at an earlier date.

---

(. . . continued)

appellant's counsel on direct appeal, did not represent appellant in a manner that satisfied the *Strickland* standard in that he did not raise the *Apprendi* issue on direct appeal, even though appellant had written him a letter in which he asked him to do so. Appellant's next counsel, Mr. Heslep, sought collateral relief in a generally appropriate way, but failed to file a motion to recall mandate of this court within 180 days as required by our Rule 41 (f), thus putting appellant in the position of having first to show good cause under Rule 26 (b) for his failure to do so in order to be able to demonstrate his entitlement to that relief. This is not to state any conclusion as to whether appellant's representation by Mr. Heslep was ineffective under *Strickland.*

Ms. Hoffmann, upon replacing Mr. Heslep, continued to seek collateral relief, persuading one member of the panel that considered *Long II* that appellant's conviction should be set aside. She filed a motion to recall mandate after collateral relief had been denied, by which time an additional three years had elapsed following conviction. The government argues that Ms. Hoffmann "cannot allege her own ineffectiveness to explain that [further] delay," and is therefore not in a position to cite the passage of that time without action by counsel as part of appellant's showing of good cause to excuse failure to seek recall of the mandate in timely fashion. We do not believe that Ms. Hoffmann's representation can be deemed ineffective. Because the time to file a motion to recall had expired well before Ms. Hoffmann's appointment as counsel, the passage of that time while she pressed the motion for collateral relief in *Long II* did not add significantly to appellant's burden to show good cause, and no additional prejudice to the government has been suggested. Her representation in seeking collateral relief was of a high order, and her success in securing the recall of the mandate in this complex matter speaks for itself.

In analyzing the remaining considerations, we note that the government has not identified any prejudice it suffered as a result of appellant's untimely filing. Given that appellant stands sentenced to serve an unconstitutionally-imposed sentence of LWOP, our weighing of the prejudice to each party in this case clearly favors appellant. We are also mindful of our preference for decisions on the merits, and do not think that the efficiency of our court system will be harmed by our deciding appellant's *Apprendi* claim on the merits.[13] *Apprendi* was decided thirteen years ago and, given the unique nature of appellant's pursuit of his claim in this case, we see little risk that our decision here will call into question the finality of mandates in more than a very few other cases. Accordingly, for these reasons, we conclude that appellant has shown good cause and permit him to press his motion to recall the mandate after the expiration of the time for bringing such a motion. We now consider appellant's motion to recall the mandate on the merits.

---

[13] Although this court considered appellant's *Apprendi* claim to a limited extent in *Long II*, the procedural posture of that case, an appeal of the rejection of a collateral attack, foreclosed a consideration of appellant's claim "on the merits." 36 A.3d at 379. As this court noted in *Long II*, the proper occasion for appellant's *Apprendi* argument was his direct appeal. *Id.* at n.12. Since appellant now persuades us to revisit his direct appeal, the earlier decision of this court in *Long II* does not stand in the way of our application of *Apprendi* here.

**II.** *Appellant's Motion to Recall the Mandate*

The proper procedural vehicle under our case law for presenting this court with a claim of ineffective assistance of appellate counsel is a motion to recall the mandate. *Watson v. United States*, 536 A.2d 1056, 1060 (D.C. 1987) (en banc). On receiving such a motion, this court will determine whether the movant has satisfied his or her "heavy initial burden" of "set[ting] forth in detail a persuasive case for recall of the mandate." *Id.* The movant must "give 'chapter and verse'" and demonstrate with "factual support" a claim of constitutional ineffectiveness, a standard "quite familiar to the court." *Id.*; *see Strickland*, 466 U.S. at 685-98. In order to succeed, a movant is required to show not just that "the court's opinion on the first appeal was wrong" but also that the court's opinion "would not have been wrong but for the ineffective assistance of counsel on the first appeal." *Watson*, 536 A.2d at 1058.[14] Once we determine that the motion has merit, "[t]his court will pursue a claim of ineffective assistance of appellate counsel . . . by recalling the mandate and reopening the movant's appeal in order to fully explore and then decide whether there was ineffective assistance of counsel on the first appeal." *Id.*

---

[14] A court's opinion can be deemed "wrong" on the basis of changes in the law that occurred pending direct appeal.

at 1061. In this opinion, we will expedite matters by combining our discussion of the motion's merit with the resolution of appellant's claim of ineffective assistance of appellate counsel.[15]

## A. *Deficient Performance*

In order for appellant's claim of ineffective assistance of appellate counsel to succeed, appellant must demonstrate (1) that the "performance of counsel fell below an objective standard of reasonableness" and (2) that appellant suffered "prejudice, *i.e.*, it must be established that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Griffin*, 598 A.2d at 1176 (internal citations and quotations omitted). Here, the deficiency of appellant's counsel on direct appeal is clear. As the government concedes, "it is unlikely that appellant's counsel had strategic reasons

---

[15] In other cases, this court has first issued an order granting the motion to recall the mandate, and then later issued an opinion on the merits of the re-opened appeal. *See Griffin v. United States*, 598 A.2d 1174 (D.C. 1991); *Streater v. United States*, 478 A.2d 1055 (D.C. 1984). We combine those procedural steps in this opinion because, in this case, resolution of the question of the motion's merit and resolution of appellant's re-opened appeal require an examination of the same issues, so that a ruling on one is essentially a decision on the other. Since both parties have presented this court with their preferred remedies should we elect to remand the direct appeal for resentencing, we perceive no barrier to a streamlined approach in this case.

for not pursuing" the *Apprendi* issue on direct appeal. We agree and cannot conceive of any reasonable "professional judgment" which would lead an attorney to disregard an issue which, at the time of appeal, would likely have resulted in the vacating of appellant's LWOP sentence and the remand of the case for resentencing. *See Dockery*, 853 A.2d at 700; *Keels*, 785 A.2d at 687. As we have said in other cases, "a single error of counsel may constitute ineffective assistance of counsel if the error is sufficiently egregious and prejudicial." *Griffin*, 598 A.2d at 1177-78. This is such a case.

## B. *Prejudice*

Next, we ask whether the failings of appellant's counsel on direct appeal affected this court's decision. In other words, we ask whether this court, had it been briefed on appellant's *Apprendi* issue, would have affirmed the judgment of conviction, including, as it did, his sentence to LWOP. Since the resolution of this question will also resolve appellant's *Apprendi* claim on the merits, we will proceed to apply this court's "plain error" analysis to that question.

**III.** *Applying "Plain Error" Review to Appellant's* Apprendi *Claim*

"'[W]here the law at the time of the trial was settled and clearly contrary to the law at the time of appeal,' as in this case, 'it is enough that an error be plain at the time of appellate consideration.'" *Keels*, 785 A.2d at 682 n.7 (quoting *(Joyce) Johnson v. United States*, 520 U.S. 461, 468 (1997)). Appellant, therefore, must demonstrate that (1) there was *Apprendi* error, (2) the error was plain, (3) the *Apprendi* error "affect[ed his] substantial rights," and (4) "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (internal citations, brackets, and quotation marks omitted). If the first three elements have been established, it is for the appellate court to decide, in the exercise of discretion, whether to notice the error. *Id.* In this case, the trial court made factual findings, beyond those made by the jury, to determine appellant's eligibility for an enhanced sentence of LWOP. There can be no dispute that, in light of *Apprendi*, the trial court's error is now clear. *See Keels*, 785 A.2d at 682-84. Appellant has satisfied the first two prongs of plain error review.

A. *Appellant's "Substantial Rights"*

To demonstrate success on the third prong, that the error affected his substantial rights, appellant has to "show a 'reasonable probability'" that, but for

the trial court's error, appellant would not have been sentenced to LWOP. *Ingram v. United States*, 40 A.3d 887, 899 (D.C. 2012) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004)); *see also Zanders v. United States*, 999 A.2d 149, 161 (D.C. 2010). Put differently, appellant must "satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *Dominguez Benitez*, 542 U.S. at 83 (citing *Strickland*, 466 U.S. at 694).

This court has recognized that the relevant question in this context, as explained by the Supreme Court in *Washington v. Recuenco*, 548 U.S. 212 (2006), is whether it can be "determined . . . that, had the sentencing factor been properly submitted to the jury, the jury would have found the element proved beyond a reasonable doubt." *Robinson II*, 946 A.2d at 339 n.8. Thus, we engage in inquiry like that previously used for determining whether or not the omission of an element of a crime from a jury instruction has prejudiced the defendant. *See Neder v. United States*, 527 U.S. 1 (1999). In *Recuenco*, the Supreme Court analogized to *Neder*, explaining that the key question for harmfulness is "whether the jury would have returned the same verdict absent the error." *Recuenco*, 548 U.S. at 221; *see also Kidd v. United States*, 940 A.2d 118, 126 (D.C. 2007) (applying *Neder*, and

finding no reversible error where evidence was strong regarding defendant's *mens rea*, even though *mens rea* language was erroneously omitted from aiding and abetting jury instruction).

B. *The Trial Court's Findings and the Evidence at Trial*

As noted earlier, the trial court found three aggravating factors present in appellant's case. Following a short sentencing hearing, the trial court issued its findings of fact. The court found "that the murder of Ronald Williamson was especially heinous, atrocious and cruel. [Appellant] murdered a youngster who was his friend. The manner in which he executed Williamson — shooting him; walking away; re-loading his gun; and walking back to put a final shot into Williamson's head — shocks the conscience of the community." The court also concluded that "Ronald Williamson was an especially vulnerable victim, due to his age." Last, the court concluded that appellant "committed this murder after substantial planning" because he "made repeated statements to his friends regarding his intent to murder Williamson and he waited outside the apartment

door where Williamson stayed that night, waiting for Williamson to leave the building.  [Appellant] then followed Williamson into the alley and shot him." Were we reviewing these findings for sufficiency in the light most favorable to the government, we might affirm.  However, because the findings were arrived at through an unconstitutional procedure, we ask instead whether the evidence so strongly supported the trial court's conclusions "that, had the sentencing factor been properly submitted to the jury, the jury would have found the element proved beyond a reasonable doubt."  *Robinson II*, 946 A.2d at 339 n.8; *see also Dominguez Benitez*, 542 U.S. at 83.

After reviewing the record as a whole, we cannot comfortably conclude that there is the requisite degree of probability that, had a jury been asked to decide the presence of the aggravating factors, it would have reached the same conclusion that the trial judge reached.  In our estimation, reasonable minds could well have disagreed about whether this murder was "*especially* heinous, atrocious, or cruel," a standard that requires a conclusion that this murder was worse than most first-degree premeditated murders.  *See Rider v. United States*, 687 A.2d 1348, 1355 (D.C. 1996) (emphasis added).

In this case, the jury heard extensive testimony about an armed feud between two groups of young men that had been going on for several weeks before Long shot Williamson. The testimony of several different witnesses established that although appellant and Williamson had once been friends and roommates, a falling out between two brothers — James and Tracy Rauch — split Long and Williamson into rival camps. Williamson, and another man, Macellus Thompson, moved out of the apartment that they and Tracy Rauch had shared with appellant, James Rauch, and William Tilghman. Thompson moved in with Tracy Rauch and his girlfriend, while Williamson began staying with his mother. After moving out of James's apartment, Williamson and Thompson were present on another occasion when Tracy fought his brother James there. Later that day, James Rauch and one of his associates, a man called Peanut, came upon Tracy Rauch, Williamson, and Thompson. Another fight broke out, and James stole Tracy's vest and phone.

The following morning, Tracy Rauch, Thompson, and Williamson, the murder victim here, went to James Rauch's apartment, where appellant and Tilghman were present. The three intruders took a television and some coats before "kick[ing] the phone jacks out" and destroying some video games. Although others disputed his account, appellant would later claim that during the encounter Tracy Rauch struck him with one gun and Williamson threatened him

with another. Thompson testified that his ally Williamson had a baseball bat, but no other weapons. In any event, bad blood remained between the two groups of men. Tilghman testified that "if [Williamson] had a got the chance to get [appellant], he would have got him."

Williamson not only participated in these conflicts, he was also armed in various ways. There was undisputed evidence that Williamson had with him a starter pistol he sometimes carried. Tilghman also testified that Williamson sometimes carried other "real guns," including a .38 revolver and "some type of shotgun . . . something like a .22 or something." On the day of the murder, Tilghman saw Williamson with a gun on two occasions, including once, hours before the murder, in the apartment building where appellant, James Rauch, and Tilghman lived. The jury also heard testimony from Tilghman suggesting that, shortly before appellant fired his gun, Williamson began to reach towards his waist as though going for a weapon.[16] After the murder, the police recovered a starter pistol, which looked like a real gun but was incapable of firing a projectile, near Williamson's body.

---

[16] Tilghman did testify that he did not "know what [Williamson] was reaching for."

We do not recount these events to suggest some *post hoc* justification for appellant's actions, but rather to place this particular premeditated murder in context. This was an escalating feud between two groups of young men, both of whom had been armed in various ways throughout. The victim had participated in the conflict; carrying, at least, a baseball bat during a bold and aggressive burglary and possibly threatening appellant with a gun while committing that crime. The victim was known to carry weapons, was actually carrying a starter pistol at the time of his death, and may have attempted to draw it when confronted in the dark alley.

All premeditated murders are to some degree heinous, atrocious, and cruel, but in order to sentence a defendant to LWOP, the murder must be *especially* heinous, atrocious, and cruel. *Rider*, 687 A.2d at 1355. Thus, the law compels an evaluation of the circumstances of the crime, and an examination of both "the murderer's state of mind" and "society's view of the murder as compared with other murders."[17] *Id.* Here, we have a crime involving two people who had spent

---

[17] We do not address appellant's "vagueness" challenge to the constitutionality of this factor, *see Rider*, 687 A.2d at 1354 (resolving statute's constitutionality under earlier procedures for imposition of life-without-parole), because it was raised for the first time at oral argument on appeal. *In re Zdravkovich*, 831 A.2d 964, 972 (D.C. 2003) (in bar discipline case, explaining

(continued . . .)

the preceding weeks as members of hostile armed groups. Although appellant's homicide was without legal justification, it was not committed at random against an unsuspecting member of the community, but rather in revenge against the perpetrator of an earlier crime who may have acted as though he was armed at the time of the shooting. *Id.* (describing "random" killings as among those considered especially heinous, atrocious and cruel); *see also Parker v. United States*, 692 A.2d 913, 917 n.6 (D.C. 1997) (affirming finding of "extremely heinous atrocious or cruel murder" in part because "the attack on [the victim] was unprovoked").

Further, appellant's crime is not clearly within the class of murders discussed by the Committee on the Judiciary when the Council of the District of Columbia enacted its LWOP statute. *Rider*, 687 A.2d at 1355. Appellant did not "tie[ ] and gag[ ]" Williamson before killing him, nor was this shooting "just for the fun of it." *Id.* Appellant also did not torture Williamson or inflict gratuitous suffering. *Cf. Parker*, 692 A.2d at 917 n.6 (murderer left victim of unprovoked attack, who was "cognizant of her injuries," "to die" and suffering "excruciating pain, physical and mental"); *Rider*, 687 A.2d at 1350-51, 1356 (affirming trial court's finding on "especially heinous, atrocious, and cruel" where, after striking

(. . . continued)
that an "argument was raised for the first time at oral argument" and therefore declining to "consider it").

fatal blow with a heavy object, defendant disfigured victim's genitalia with a knife while the victim was still breathing); *Henderson v. United States*, 678 A.2d 20, 23 (D.C. 1996) (murder committed during burglary "especially heinous atrocious or cruel" because "the death in this case was a form of torture" as victim was stabbed repeatedly and had her throat cut before eventually being strangled). Considering that the courts deal with a significant number of seemingly more inhumane crimes, we cannot conclude that a jury would have agreed with the conclusion the trial court reached on this factor, even if we cannot label the trial court's decision "wrong." After *Apprendi*, the decision is not the trial court's to make, and we can affirm only if we have confidence that a jury would reach the same outcome. For the reasons we have given above, we do not.[18]

---

[18] We note the trial court's use of appellant's suppressed confession in making its findings of fact and conclusions of law in connection with sentencing. The trial court used appellant's confession, at least in part, to reach its conclusion that appellant actually was the shooter. We observe that there is now substantial doubt that a jury charged with deciding whether aggravating factors were present in this premeditated murder case would be permitted to consider appellant's confession. Some members of the jury had, at one point, given the impression that they might have decided the specific factual question of whether appellant was the shooter differently, even though it ultimately had no impact on the verdict because of the principles of co-conspirator liability. *See Long II*, 36 A.3d at 393-94 (Schwelb, J. dissenting) (describing trial court's affirmative response to jury note asking if appellant could be convicted upon a finding that either appellant or Tilghman murdered Williamson).

(continued . . .)

Having found that appellant would be entitled to vacation of the trial court's findings on one of the aggravating factors, the especially heinous nature of the crime, we need not examine the quality of the proof underlying the two remaining aggravating factors that the trial court found present. In *Keels*, we held that

---

(. . . continued)

Although it was admissible at the time, *see United States v. Acosta*, 303 F.3d 78, 84 (1st Cir. 2002) (noting that "ten other circuits have ruled that in most circumstances, the Fourth Amendment exclusionary rule does not bar the introduction of suppressed evidence during sentencing proceedings"), we are not confident that evidence suppressed for the purposes of determining proof of the elements of a crime may be admitted when a jury considers proof of sentencing factors. The Supreme Court has ruled that "elements" and "sentencing factors" cannot be meaningfully distinguished when proof of either exposes a defendant to greater punishment. *See Ring v. Arizona*, 536 U.S. 584, 602-09 (2002) (discussing the case law on elements and "aggravating factors" before ruling that aggravating factors which increase the maximum punishment available for a crime are "the functional equivalent of an element of a greater offense." (quoting *Apprendi*, 530 U.S. at 494 n. 19)). Further, in the analogous setting of a death penalty sentencing trial, the federal courts have excluded evidence on constitutional grounds. *See, e.g.*, *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (noting that at a sentencing trial under the Federal Death Penalty Act, "it remains for the court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial").

Accordingly, we are doubtful that the general inapplicability of the exclusionary rule at sentencing still holds when the sentencing hearing is actually being conducted to prove defendant's guilt of what are, functionally, elements of a crime. Thus, although the other considerations we have explained are sufficient to keep us from concluding that the jury would have found the murder *especially* heinous, the issues raised by the trial judge's consideration of the confession further undermine our confidence that the jury would have reached the same result reached by the trial judge.

"[b]asic fairness thus requires that the trial judge conduct the sentencing of [appellant] un-influenced by a misapprehension as to the extent of his eligibility for a punishment as severe as LWOP." 785 A.2d at 687. In that case, even though one of the aggravating factors had been proven to the jury, we remanded for resentencing after concluding that two other aggravating factors were considered unconstitutionally by the judge. *Id.* at 686-87. Here, we follow a similar approach. Appellant has demonstrated that he was prejudiced by the trial court's actions with regard to at least one factor under *Apprendi* and *Recuenco*. Provided he can satisfy the fourth prong of the plain error test, he will be entitled to a remand for re-sentencing.

## C. *The Fourth Prong of the Plain Error Test*

Appellant has established that he was prejudiced by a plain *Apprendi* error. If he can also show that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings," then this court may, in the exercise of discretion, decide to notice the error. *Johnson*, 520 U.S. at 467 (internal citations

and quotation marks omitted).[19] Our holding in *Keels* makes it clear that the fourth prong should be deemed satisfied here.

In *Keels*, as in this case, appellant had been sentenced to LWOP by the trial judge before the Supreme Court decided *Apprendi*. We permitted counsel for appellant in *Keels* to file a supplemental brief raising the *Apprendi* issue. In imposing LWOP, the trial judge had relied on three aggravating factors. We were satisfied that one of them — that the first degree felony murder had been "committed while committing or attempting to commit a robbery," *Keels*, 785 A.2d at 686 — was coextensive with the jury's finding that Keels was guilty of that charge. The remaining two factors on which the trial judge based the sentence to LWOP, however, were not matters that the jury had been called upon to decide. Concluding that the misconception as to the number of aggravating factors properly before her may have seriously affected the judge's exercise of sentencing discretion, we stated:

---

[19] At oral argument, the government conceded that this court could take into account the entire history of this case, as distinguished from limiting our consideration to the proceeding in which Long was convicted and sentenced, when determining whether the fourth factor had been satisfied. As we find it unnecessary to look beyond the proceeding in question, we will not decide whether it is appropriate to look beyond that proceeding to determine whether the fourth element is satisfied.

> *Basic fairness* thus requires that the trial judge conduct the sentencing of Keels uninfluenced by a misapprehension as to the extent of his eligibility for a punishment as severe as LWOP. *See generally United States v. Tucker*, 404 U.S. 443, 448-49 (1972); *In re L.L.*, 653 A.2d 873, 889 (D.C. 1995) ("Where a judge, in exercising her discretion, has . . . misapprehended the applicable legal principles, we often remand the case for reconsideration under the correct standards."); *cf. (James) Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979).

*Keels*, 785 A.2d at 687 (emphasis added). On the basis of our conclusion that the requirements of basic fairness had not been met, this court rejected the government's contention that Keels had not met the fourth part of the standard for plain error. *Id.* at 682, n.7 & 687.

In the case before us, the lack of fairness is more obvious than in *Keels*. Here the jury had not made findings coextensive with any of the three aggravating factors on which the trial judge based the imposition of LWOP. Accordingly, we conclude that the public reputation of judicial proceedings would suffer if we allowed appellant's sentence to stand.

**IV.** *Conclusion and Remand*

For the foregoing reasons, we grant appellant's motion to recall the mandate as sufficiently meritorious, and after re-opening appellant's direct appeal, we conclude that appellant was prejudiced by the ineffective assistance of his appellate counsel. Therefore, we remand for resentencing.[20] When remanding for the correction of similar errors in the past, this court has vacated all the sentences imposed on a defendant in order to afford the trial court "the opportunity to resentence on all charges as the structure of the entire sentence may have been affected by the LWOP sentence for first-degree murder."[21] *Dockery*, 853 A.2d at 701. The government has requested that we take a similar approach in this case.[22]

---

[20] The mandatory minimum for first degree premeditated murder is 30 years. D.C. Code § 22-2104 (2001). While this is far less onerous than LWOP, it is nevertheless a very substantial sentence. The dissenting opinion in *Long II* noted that prior to the first trial Long had been offered a favorable plea agreement. 36 A.3d at 396. Long's present counsel informs the court that the proposed agreement would have exposed Long to a sentence of eight years and four months, and that he would have been eligible for sentencing under the Youth Corrections Act. Long preferred to stand trial.

[21] Under *Keels*, appellant will have to be resentenced in compliance with *Apprendi*. *See Keels*, 785 A.2d at 687 (remanding for the trial court to "impose sentence with appreciation of the limits *Apprendi* imposes on the determination of eligibility for [life without parole].").

[22] At one point in these proceedings, the government requested that, if this court should decide to remand, we also permit the government to present evidence of appellant's "guilt" of the sentencing factors to a new jury. At oral argument, the government withdrew this request, and requested that we follow the *Dockery* approach described above. We rely on the government's affirmative waiver and do

(continued . . .)

Consistent with our precedent in similar cases, we order all of appellant's sentences associated with this verdict vacated so that the trial court may structure an appropriate sentence on remand.

*So ordered.*

---

(. . . continued)
not address the issues discussed at oral argument relating to such a jury proceeding. We offer no opinion regarding issues that might be raised at a second trial on sentencing factors before a new jury in this case.