*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 22-CO-0342

COLIE L. LONG, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(1996-FEL-002346)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued January 30, 2024                    Decided April 11, 2024)

*Matthew B. Kaplan* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant United States Attorneys, were on the brief, for appellee.

*Zoé Friedland*, with whom *Samia Fam* and *Alice Wang* were on the brief for Public Defender Service, *amicus curiae*.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In the early morning hours of March 19, 1996, appellant Colie L. Long shot and killed fourteen-year-old Ronald Williamson. After nearly two decades of subsequent litigation regarding his convictions and sentence,

the trial court ultimately sentenced Mr. Long to life in prison. *See Long v. United States*, 163 A.3d 777, 779 (D.C. 2017).

In November 2021, Mr. Long requested that the trial court reduce his sentence under the Incarceration Reduction Amendment Act ("IRAA"), D.C. Code § 24-403.03. During the pendency of his motion, Mr. Long was released from prison on parole. Two days after his release, the trial court denied his IRAA motion due to concerns about Mr. Long's release plan and his disciplinary history while incarcerated. Mr. Long now appeals.

This appeal requires us to decide, among other issues, whether parolees are ineligible for relief under the IRAA due to their release from prison. We conclude that a parolee's release from prison does not automatically render them ineligible for a sentence reduction under the IRAA. We further conclude that the trial court committed legal error in denying Mr. Long's IRAA motion. We therefore vacate the order and remand to the trial court for reconsideration in light of this opinion.

## I.    Background

In 1996, Mr. Long, then eighteen years old, shot and killed fourteen-year-old Ronald Williamson. *See Long v. United States*, 83 A.3d 369, 372 (D.C. 2013). A jury convicted Mr. Long of first-degree premeditated murder while armed, among

other crimes. *Id.* at 373. Mr. Long was initially sentenced to life imprisonment without the possibility of parole. This court, however, twice vacated Mr. Long's sentence, and he was ultimately sentenced to life with the possibility of parole. *Long v. United States*, 163 A.3d 777, 779, 781, 790 (D.C. 2017). Mr. Long became parole-eligible on October 12, 2021.

On November 3, 2021, Mr. Long filed a "Motion to Reduce Sentence Under the [IRAA]" in which he asked the trial court to "reduce his sentence so that he may immediately be released from confinement." The IRAA provides that the Superior Court "shall reduce a term of imprisonment imposed upon a defendant for an offense committed before the defendant's 25th birthday if" the defendant "has served at least 15 years in prison" and the court finds, after considering the factors set forth in subsection (c) of the statute, that "the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a).

As discussed in more detail below in Part II.D.1., the trial court held a hearing on the motion, at which Mr. Long presented testimony from five witnesses, including himself.

During the pendency of the trial court's consideration of his motion, Mr. Long separately sought parole from the United States Parole Commission. The Parole

Commission granted his request and scheduled his release for July 29, 2022. On April 19, 2022, the trial court received the Parole Commission's decision to release Mr. Long on parole. Two days later, on April 21, 2022, the trial court issued its order denying Mr. Long's IRAA motion, from which Mr. Long now appeals. The government represents that Mr. Long was released from prison on parole on July 29, 2022.

## II.     Analysis

On appeal, Mr. Long asserts that the trial court abused its discretion in denying his IRAA motion. Before reaching that argument, however, we must address the government's three preliminary arguments that speak to whether we can afford Mr. Long the relief he seeks. In particular, the government asserts that: (1) Mr. Long's appeal is moot; (2) to the extent that Mr. Long seeks justiciable relief, he failed to preserve that relief by requesting it in Superior Court; and (3) the IRAA does not extend relief to parolees. We consider each issue in turn.

### A.     Mootness

Although this court is not constitutionally bound by the "cases" or "controversies" limitation of Article III of the United States Constitution, we generally adhere to it for prudential reasons. *Animal Legal Def. Fund v. Hormel*

*Foods Corp.*, 258 A.3d 174, 181 (D.C. 2021). Moot cases do not satisfy the "cases" or "controversies" limitation of Article III, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-61 (2016), and "this court does not normally decide [such] cases," *Cropp v. Williams*, 841 A.2d 328, 330 (D.C. 2004) (per curiam). The "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation omitted). "This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* (internal quotation omitted). An appeal is moot when it is "impossible or unnecessary" for the court to grant relief. *Classic CAB v. D.C. Dep't of For-Hire Vehicles*, 244 A.3d 703, 705 (D.C. 2021). "The burden of demonstrating that a case is moot falls heavily upon the party asserting mootness." *Jackson v. George*, 146 A.3d 405, 416 (D.C. 2016) (internal quotation and brackets omitted).

The government asserts three separate "mootness" arguments, the latter two of which do not properly implicate mootness. We address them seriatim.

**1.     Whether Mr. Long's release on parole rendered his appeal moot**

The government first contends that Mr. Long's "release from prison mooted his appeal." In particular, the government argues that "[t]he relief [Mr.] Long seeks

on appeal—vacatur of the trial court's order and remand 'with instructions that [Mr.] Long be resentenced'"—is both "impossible" and "unnecessary" due to his release on parole.

If Mr. Long only sought "release" from prison, the government would be indisputably correct that his appeal is now moot. Such relief would be impossible for this court to grant because it has already occurred.

But because Mr. Long seeks a sentence reduction, his appeal presents an "actual injury traceable to" his sentence, *Spencer*, 523 U.S. at 7, that is redressable by this court. Despite his release from prison, Mr. Long continues to suffer at least two redressable injuries. First, the conditions of release imposed by the parole process constitute an injury under Article III. "[P]arolees are on the continuum of state-imposed punishments." *Samson v. California*, 547 U.S. 843, 850 (2006) (internal quotation omitted). Although parolees are released from "immediate physical imprisonment, [parole] imposes conditions which significantly confine and restrain [a parolee's] freedom." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). Parole is "an established variation on imprisonment of convicted criminals." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972); *In re Dortch*, 860 A.2d 346, 362 (D.C. 2004) ("Parole is a continuation of an offender's sentence; it is a state of conditioned liberty; a prison without walls.") (internal quotations omitted). We

therefore agree with Mr. Long that he still faces significant restrictions on his liberty imposed by parole, which constitute a cognizable Article III injury. *See Spencer*, 523 U.S. at 7 (restrictions on liberty imposed by the terms of parole "constitute[ ] a concrete injury").

Second, Mr. Long's sentence remains operative despite his release on parole and itself constitutes an independent injury. In the District, a parolee continues to serve his or her sentence despite a conditional release from prison. Parolees "remain in the legal custody and under the control of the Attorney General of the United States or his or her authorized representative until . . . [t]he expiration of the maximum term or terms specified in his or her sentence" or the sentence is otherwise terminated, D.C. Code § 24-404(a), and may be arrested and re-imprisoned for a violation of parole conditions "at any time within the term or terms of [the parolee's] sentence," *id.* § 24-405. The very existence of an operative sentence of imprisonment is therefore injurious for Article III purposes because it is under that sentence that the individual must surrender his or her legal custody to the state and from which flows a risk of re-incarceration.[1] *See* Brian R. Means, *Post-Conviction*

---

[1] This is so, at least, unless the Parole Commission "terminate[s] legal custody over the parolee before expiration of the parolee's sentence" or the parolee is otherwise "discharge[d] . . . from supervision prior to the expiration of the maximum term or terms for which he was sentenced." D.C. Code § 24-404(a-1)(1), (b).

*Remedies* § 8:4 (2023) ("[A] challenge to a *sentence* that the individual is presently serving satisfies the case-or-controversy requirement."); *cf. Spencer*, 523 U.S. at 7 ("Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained.").[2]

Both of these injuries are redressable by this court as any other challenge to a convict's sentence or parole conditions would be. *See Spencer*, 523 U.S. at 7 ("An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction."). It is not "impossible," *Classic CAB*, 244 A.3d at 705, for this court to render effective relief. We could, for example, reduce Mr. Long's sentence to time served, completing his sentence and lifting his parole conditions. Nor is it "unnecessary," *id.*, for this court to relieve Mr. Long of the above injuries: Mr. Long has a continued interest in a reduced sentence. Because Mr. Long's appeal presents concrete injuries capable of redress by this court, his release from prison does not moot his appeal.

---

[2] We do not decide whether an expired sentence may also give rise to an injury redressable by this court.

### 2. Whether Mr. Long's appeal is moot because the IRAA does not extend relief to parolees

The government also argues that Mr. Long's appeal is moot because the plain language of the IRAA does not extend relief to parolees. In particular, the government argues that because the trial court lacks authority to resentence former prisoners under the IRAA, Mr. Long's appeal is moot.

The government miscasts its statutory-interpretation argument as a mootness problem. Irrespective of what the IRAA authorizes, an argument questioning "the legal availability of a certain kind of relief," couched as a claim of mootness, "confuses mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013).[3] "[W]hether the class of litigants of which [Mr. Long] is a member may use the courts to enforce the right at issue" does not speak to the justiciability of the dispute. *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (noting that the court of appeals "confuse[d] the question of whether petitioner had standing with the question of whether she had asserted a proper cause of action"); *see Powell v. McCormack*, 395 U.S. 486, 500 (1969) (argument that a claim was brought in the wrong court "confuses mootness with whether [the plaintiff] has established a right to recover").

---

[3] Mootness may, however, present a barrier when the claim is "so insubstantial, implausible, foreclosed by prior decisions . . . , or otherwise completely devoid of merit as to not involve a" case or controversy. *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 667 (1974).

The absence of a valid cause of action does not typically implicate a court's power to adjudicate the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92 (1998). Courts have jurisdiction to decide a case even if one interpretation of a statute leaves the complaining party without relief. *Id.*; *see also Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 278 (1st Cir. 2022) ("That a plaintiff's ultimate recovery may be uncertain or even unlikely is of no moment to the mootness inquiry. Instead, we assume the claim's legal validity to determine whether it is nonetheless moot.") (internal quotations, alteration, and citation omitted), *vacated on other grounds*, *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1 (2023).

If the government's statutory interpretation argument is correct, then Mr. Long has no right to relief under the IRAA. But that does not mean his claim is moot.

### 3. Whether Mr. Long's appeal is moot because he failed to request justiciable relief in Superior Court

Finally, the government argues that Mr. Long's appeal is moot because he "secured the only relief he actually sought: 'immediate release' from incarceration." It points to language in Mr. Long's IRAA motion asking the court to "reduce his sentence so that he may immediately be released from confinement." Accordingly, the government argues, it is "unnecessary" to consider Mr. Long's appeal. Implicit

in this argument is that mootness is tied to the relief Mr. Long sought in Superior Court.

Contrary to the government's framing, whether Mr. Long articulated his current request for relief before the trial court raises an issue of preservation, *see infra* Part II.B., not one of mootness.  Mootness is not indexed to the particular claims raised before the trial court but involves whether "the parties have presented [a] justiciable controversy *to the appellate court*," or whether some event has "render[ed] relief impossible."  *In re Z.M.*, 272 A.3d 1183, 1190 (D.C. 2022) (emphasis added) (internal quotations omitted); *see also Thorn v. Walker*, 912 A.2d 1192, 1195 (D.C. 2006) ("In deciding whether a case is moot, we determine whether *this court* can fashion effective relief.") (emphasis added) (alterations omitted).

Mr. Long now clearly asks this court to remand for the trial court to grant his IRAA motion so that he may obtain a sentence reduction.  That claim for relief— whether or not actually raised in the Superior Court and thus preserved on appeal— presents a live and justiciable controversy for the reasons set forth above.

## B.    Preservation

Assertions of mootness aside, the government contends that Mr. Long never "actually sought" a sentence reduction in Superior Court and that his IRAA motion

was in fact limited to seeking an "immediate release" from prison. In the government's view, Mr. Long and the Public Defender Service (PDS) only "now seek to recast [Mr. Long's] argument as a challenge to parole supervision and his release conditions." It asserts that Mr. Long only requested a "sentence reduction" so that he might be "immediately release[d]" from prison.

We disagree. The relief contemplated by the IRAA is the "reduc[tion of] a term of imprisonment . . . ." D.C. Code § 24-403.03(a). Mr. Long preserved his request for this justiciable relief by requesting a "sentence reduction" from the Superior Court. The title of his motion is "Motion to *Reduce Sentence* Under the [IRAA]." The first sentence of the motion is as follows: "Colie L. Long, through undersigned counsel, respectfully requests that the Court *reduce his sentence* in this case under [the IRAA]." In its concluding paragraph, Mr. Long "move[d] [the Superior Court] to *reduce his sentence* so that he may immediately be released from confinement." Mr. Long thus clearly alerted the trial court and the government to the fact that he sought a reduced sentence. *See Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (requiring only that litigants raise arguments "with sufficient precision to indicate distinctly the party's thesis" (internal quotation omitted)).

It is of no consequence that Mr. Long sought a sentence reduction "so that he may immediately be released from confinement." The quoted language does not

alter the core of Mr. Long's request for a reduced sentence. Rather, it functioned only to alert the trial court to how much time Mr. Long wanted shaved off his sentence if the court were to grant his motion. More fundamentally, the government confuses Mr. Long's *motivation* for the requested relief with the requested relief itself.

### C.    Whether the IRAA Extends Relief to Parolees

The government contends that the IRAA does not extend relief to paroled former prisoners. Before addressing that question, however, we must first decide whether the government's argument is properly before us.

### 1.    Whether this argument is properly before us

Generally, this court will address only those arguments raised in, and addressed by, the trial court. *John C. Flood of MD, Inc. v. Brighthaupt*, 122 A.3d 937, 944 (D.C. 2015) (noting the "well-established appellate principle that we do not decide issues on appeal that were neither raised nor decided in the trial court" (internal quotation marks omitted)). "It is fundamental that arguments not raised in the trial court are not usually considered on appeal." *Thornton v. Norwest Bank of Minn.*, 860 A.2d 838, 842 (D.C. 2004).

PDS asserts that the issue whether the IRAA extends relief to parolees is not properly presented on appeal. After addressing the government's statutory argument at length in its briefing here, it argued that, "because Mr. Long was 'presently incarcerated' and not yet released on parole at the time his IRAA motion was decided, this case does not present any occasion for this Court to decide whether parolees are eligible for IRAA relief."

We agree with PDS that the issue whether parolees are eligible for relief under the IRAA was neither presented in nor decided by the trial court. Neither Mr. Long nor the government raised the issue—and for good reason; the Parole Commission granted Mr. Long's request for parole just two days before the trial court issued its order denying his IRAA motion, and Mr. Long was not actually released until approximately three months after the order on review. The trial court therefore had no occasion to consider directly the effect of Mr. Long's parole on his eligibility for a reduced sentence under the IRAA. Nor can we say that the trial court implicitly relied on Mr. Long's then-impending release on parole in denying his motion. Although the trial court mentioned that the strictures of parole would be "necessary to ensure [Mr. Long's] transition [from prison] in a way that minimizes the risks" that the court identified in its order, it did not consider Mr. Long's parole status in any portion of its IRAA analysis. Only after it determined that Mr. Long was ineligible for relief under the enumerated factors did the trial court mention that

Mr. Long had been granted parole. In fact, it concluded that Mr. Long "failed to meet his burden" under the IRAA "*[n]otwithstanding* the decision of the Parole Commission."

That this issue was not raised in or decided by the trial court, however, does not foreclose us from addressing it. The principle that, "[n]ormally, a claim that was not raised or passed on in the trial court will be spurned on appeal" is one of discretion, not jurisdiction. *Tilley v. United States*, 238 A.3d 961, 969 (D.C. 2020) (internal quotation omitted). In fact, "[w]e have repeatedly affirmed our discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, [ ] the factual record is complete, and a remand for further factual development would serve no purpose." *In re Ta.L.*, 149 A.3d 1060, 1073 (D.C. 2016) (en banc). We reserve this discretion for "exceptional situations." *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33 n.3 (D.C. 2001) (internal quotation omitted).

We conclude that this is one of the "exceptional situations" justifying the exercise of our discretion to reach an issue that the trial court did not address. *See id.* First, the parties' failure to raise the issue in Superior Court is entirely excusable. As noted above, Mr. Long was not released on parole until approximately three months after the trial court denied his motion. The Parole Commission did not grant

Mr. Long's parole request until two days before the court issued the order on review. Second, the parties—including both institutional litigants with an interest in our interpretation of the IRAA—have briefed the issue at length. Third, this case fits squarely within the mold of cases in which we have traditionally exercised our discretion to address issues not decided by the trial court: it presents a purely legal issue, contains a complete record, and would not otherwise benefit from further factual development. *See Helen Dwight Reid Educ. Found*, 766 A.2d at 33 n.3 (noting that the "factual component of [a] mixed question" of law and fact regarding statutory requirements for exemption from property taxation "were developed" in Superior Court and "[a]ll that is left is the legal significance of those facts, an issue which the [parties] have briefed fully on appeal"). All that remains is to decide whether the IRAA extends relief to parolees. Fourth, the issue is determinative in this case; if the IRAA does not extend relief to parolees, the denial of Mr. Long's motion must be affirmed. Finally, this is an important issue of first impression that is likely to recur if not otherwise answered.[4] *Cf. BiotechPharma, LLC v. Ludwig & Robinson, PLLC*, 98 A.3d 986, 993 (D.C. 2014) (addressing appellee's challenge to the validity of a D.C. Bar rule raised for the first time on appeal because it involved "many of the same claims raised" but left unresolved in a previous case); *Pajic v.*

---

[4] In its amicus brief, PDS lists a number of IRAA matters presenting this issue. *See* PDS Br. at 7; *see also Jackson v. United States*, No. 23-CO-0324; *Caston v. United States*, No. 21-CO-0855.

*Foote Properties, LLC*, 72 A.3d 140, 146 (D.C. 2013) (addressing legality of a lease's fee-shifting provision not raised by tenant in trial court so that future pro se tenants would not fear going to court at the risk of incurring fees they would not know to challenge). Accordingly, we exercise our discretion to reach the statutory construction issue raised by the government.

### 2. Whether the IRAA extends relief to parolees

We review questions of statutory construction de novo. *Price v. Bd. of Ethics and Gov't Accountability*, 284 A.3d 1019, 1023 (D.C. 2022). "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for the statute's full text[ and] language as well as punctuation, structure, and subject matter." *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) (internal quotation omitted). "Generally speaking, if the plain meaning of statutory language is clear and unambiguous and will not produce an absurd result, [this court] will look no further." *Id.* (internal quotation omitted). "[I]n examining the statutory language, it is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation and brackets omitted). We may refer to a statute's grammar and "use of a verb tense" in discerning its meaning. *United States v. Wilson*, 503 U.S.

329, 333 (1992). "If, in the process of discerning [statutory] meaning, we happen to consult grammar . . . we do so because the rules that govern language often inform how ordinary people understand the rules that govern them." *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021).

Before reviewing the IRAA's text, we consider the relationship between parole and the IRAA. Contrary to the government's framing, the IRAA is not simply parole by another name. The two mechanisms are motivated by different policy considerations, operate under different procedures, and achieve different objectives. Underlying the IRAA is a body of scientific evidence "demonstrat[ing] that the frontal lobes of the brain, which control executive functions like planning, working memory, and impulse control . . .[,] may not be fully developed until the mid-twenties." Comprehensive Youth Justice Amendment Act of 2016, Report on Bill No. 21-0683 before the Committee on the Judiciary, Council of the District of Columbia, at 3 (Oct. 5, 2016); *see also Bishop v. United States*, 310 A.3d 629, 635, 645-46 (D.C. 2024) (detailing the D.C. Council's scientific basis for the IRAA). The IRAA recognizes that eligible inmates are deserving of an opportunity to seek early release from their sentences because they were less developmentally culpable when they committed their crimes. The justifications traditionally advanced to support parole, by contrast, are rehabilitation and deterrence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 8 (1979). Moreover, while the Parole Board

administers parole, courts administer the IRAA. *See Williams v. United States*, 205 A.3d 837, 849-50 (D.C. 2019); D.C. Code § 24- 404(a).[5] Indeed, the government concedes, as it must, that parole-eligible prisoners may simultaneously pursue parole and relief under the IRAA. *See* Gov. Br. at 24-25. The original version of the IRAA restricted relief to those who were not yet parole-eligible. In 2019, however, the D.C. Council specifically removed that limitation, though it did so without comment. *Compare* D.C. Code § 24-403.03(a)(1)(A) (2017) (limiting IRAA eligibility to defendants who have "served at least 20 years in prison and not yet become eligible under [§ 24-404.04] for release on parole from the sentence imposed"), *with* D.C. Code § 24-403.03(a)(1) (2021).

Perhaps the most important distinction between parole and the IRAA, however, is that the two mechanisms offer fundamentally different kinds of relief. The former authorizes a prisoner's conditional release from incarceration pending completion of his or her sentence, D.C. Code § 24-404(a); the latter authorizes courts to modify the defendant's sentence by "reduc[ing] a term of imprisonment imposed

---

[5] We therefore reject the government's argument that Superior Court judges "assume responsibility over parolees from the [Parole Commission]" by granting relief to those individuals under the IRAA. That the IRAA may have an incidental effect on a movant's parole status does not somehow transfer authority over parolees from the Parole Commission to the Superior Court. *See* D.C. Code § 24-404(a)(1)-(2).

upon [the] defendant," D.C. Code § 24-403.03(a). True, as with parole, a successful IRAA motion may (but need not) result in a prisoner's immediate release from incarceration. But under our parole system, the conditions of parole and the attendant threat of re-incarceration significantly curtail the parolee's liberty for the remainder of his or her sentence. Not so under the IRAA. Successful movants receive a reduced sentence and, in at least some cases, unconditional release. *See Williams*, 205 A.3d at 849 (the IRAA authorizes courts to "alter [a movant's] sentence in various other ways and even reduce it to time served, effecting the prisoner's prompt release, based on [a] determination of his reformation and suitability for such relief"). In other words, the relief provided by parole is not coextensive with the relief provided under the IRAA.

The government therefore over-reads some of our language in *Williams*. To be sure, we noted similarities between parole and the IRAA. *See id.* at 847-48 (the IRAA's "standard [for a reduced sentence], in conjunction with the requirement that the defendant must have served at least [fifteen] years of his prison term, is essentially equivalent to the standard for granting parole"). Indeed, the central holding of *Williams* is that the IRAA, like parole, "provides [defendants] with the requisite 'meaningful opportunity' to obtain release from prison" as required by the Supreme Court's Eighth Amendment jurisprudence regarding juvenile sentences of life without parole. *Id.* at 841.

But the "essential[ ] equival[ency]" of parole and the IRAA identified in *Williams* was limited largely to a *constitutional* equivalency, not a practical one. *See id.* at 849 ("The sentence appellant is serving is now equivalent, *for Eighth Amendment purposes*, to a life sentence with parole eligibility—a sentence the Eighth Amendment permits.") (emphasis added); *id.* ("The IRAA's provision of this opportunity for release does all the Supreme Court has said is necessary in its juvenile [life-without-parole] cases for such sentences to pass muster under the Eighth Amendment . . . ."). In fact, *Williams* expressly recognized many important distinctions between parole and the IRAA. For example, "[t]he IRAA judicial hearing is superior to a parole hearing in [certain] respects, for one reason because the IRAA explicitly requires judges to give individualized consideration to the factors specific to juveniles that counsel *against* sentencing them to a lifetime in prison." *Id.* at 853 (internal quotations omitted). "In addition, the formal judicial hearing envisioned by the IRAA provides defendants significant procedural guarantees, in contrast to the 'minimal' procedures that the Constitution requires in parole proceedings. These include a fuller opportunity to present relevant evidence . . . with the assistance of counsel, and a written, structured decision by the judge that is subject to more stringent constitutional and statutory requirements and is more fully reviewable on appeal." *Id.* (footnotes omitted) (quoting *Swarthout v.*

*Cooke*, 562 U.S. 216, 220 (2011)). Therefore, although related for constitutional purposes, parole and the IRAA are otherwise distinct.

With this context in mind, we turn to the text of the statute. The IRAA provides, in relevant part, that courts "shall reduce a term of imprisonment imposed upon a defendant for an offense committed before the defendant's 25th birthday if: (1) The defendant was sentenced [or committed] pursuant to [certain statutes] . . . and has served at least 15 years in prison; and (2) The court finds . . . that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a)(1)-(2). In considering whether a movant satisfies subsection (a)(2), the trial court must review the following eleven factors:

> (1) The defendant's age at the time of the offense;
>
> (2) The history and characteristics of the defendant;
>
> (3) Whether the defendant has substantially complied with the rules of the institution to which the defendant has been confined, and whether the defendant has completed any educational, vocational, or other program, where available;
>
> (4) Any report or recommendation received from the United States Attorney;
>
> (5) Whether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction;

(6) Any statement, provided orally or in writing, provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased;

(7) Any reports of physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals;

(8) The defendant's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

(9) The extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense;

(10) The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, and the defendant's personal circumstances that support an aging out of crime; and

(11) Any other information the court deems relevant to its decision.

*Id.* § 24-403.03(c). The IRAA also instructs courts to "endeavor to prioritize consideration of the applications of defendants who have been incarcerated the longest." *Id.* § 24-403.03(g).

Although not neatly divided by the text of the statute, we read subsections (a) and (a)(1) as setting forth the IRAA's eligibility criteria. A movant is eligible for a sentence reduction under IRAA relief if he or she (1) committed the relevant offense before the age of twenty-five, (2) "was sentenced pursuant to § 24-403 or § 24-403.01, or was committed pursuant to § 24-903," and (3) "has served at least 15 years in prison." *Id.* § 24-403.03(a). If a movant satisfies these eligibility criteria, a court moves to the merits criteria set forth in subsection (a)(2). This inquiry instructs courts to ensure that "the [movant] is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification" in light of the "factors set forth in subsection (c)." *Id.* § 24-403.03(a)(2).

The government argues that parolees, as a class, are ineligible for IRAA relief because the phrase "has served at least 15 years in prison" requires the movant to be physically incarcerated for the whole of his or her IRAA proceedings. We disagree. The IRAA does not limit relief only to those who are physically incarcerated. We hold instead that if a movant has served the requisite 15 years in prison, their

subsequent release on parole does not necessarily render the movant ineligible for IRAA relief.[6]

As noted above, the IRAA sets forth an exhaustive set of eligibility criteria in subsections (a) and (a)(1). We find it significant that nowhere among those criteria is a requirement that the movant be presently incarcerated. Given the statute's otherwise express conditions of eligibility for relief, such an omission "should be understood as [an] exclusion[ ]." *McCray v. McGee*, 504 A.2d 1128, 1130 (D.C. 1986) (noting the "basic rule of statutory construction" that "when a legislature makes express mention of one thing, the exclusion of others is implied, because there is an inference that all omissions should be understood as exclusions") (internal quotations omitted). "[A]s in any field of statutory interpretation, it is our duty to respect not only what [the legislature] wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019).

It is true that certain omissions may simply reflect a legislature's "inadvertent failure to focus on [ ] less typical" circumstances, such as the one presented here. *J.P. v. District of Columbia*, 189 A.3d 212, 219 (D.C. 2018). But the lack of any express requirement that a movant be physically incarcerated does not appear to be

---

[6] We do not decide whether classes of movants other than parolees who have been released from physical incarceration—such as those on probation or supervised release—are also eligible for relief under the IRAA.

a mere oversight. Rather, the Council specifically removed language limiting IRAA relief to movants who had "not yet become eligible . . . for release on parole from the sentence imposed." *Compare* D.C. Code § 24-403.03(a)(1)(A) (2017), *with* D.C. Code § 24-403.03(a) (2019). We assume this alteration to be of consequence. *See Nat'l Assn' of Broads. v. Librarian of Cong.*, 146 F.3d 907, 919 (D.C. Cir. 1998) ("When the legislature deletes certain language as it amends a statute, it generally indicates an intent to change the meaning of the statute.") (internal quotations omitted); *see also Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

Although the "*expression unius* maxim . . . must be applied with a considerable measure of caution," *Council of D.C. v. Clay*, 683 A.2d 1385, 1390 (D.C. 1996), we cannot discern any plausible explanation for the Council's removal of this language, except that it intended to sever the link between parole and eligibility for relief under the IRAA. It is highly unlikely that the Council intended to allow individuals to *apply* for relief under both the parole system and the IRAA simultaneously but implicitly render *granting* the different forms of relief mutually exclusive. This is especially so when, as noted above, the two mechanisms offer fundamentally different forms of relief and a parolee would benefit from a sentence reduction as much as a prisoner. We do not doubt that relief under the IRAA is

primarily directed toward prisoners. But the lack of any express limitation of IRAA relief to current prisoners is significant.

The government counters that the present-perfect verb tense of the phrase "has served" as used in subsection (a)(2) signifies the Council's intent that only current prisoners are eligible for IRAA relief. In particular, the government contends that when a statute denotes a "relatively definite" time period, "the 'action' (imprisonment) must 'continue to the present'; otherwise, 'the present perfect would not be the right tense.'" Gov. Br. at 15 (alterations omitted) (quoting Bryan A. Garner, *Garner's Modern English Usage*, at 897 (4th ed. 2016)). In such a case, the government argues, the simple-past tense is appropriate. *See id.* ("It is 'error[ ]' . . . 'to use the present-perfect form when the time is definite but the action doesn't touch the present.'") (emphasis omitted) (quoting Garner, *supra*, at 897). Therefore, "[s]ince [Mr.] Long is no longer imprisoned, describing the length of his past imprisonment calls for use of the simple past tense[.]" *Id.* Because the Council did not use the simple-past tense, so the argument goes, it meant that imprisonment must continue into the present. The government's argument would render parolees as a class ineligible for relief under the IRAA.

We find the Council's use of the present–perfect phrase "has served" ambiguous or, at most, of little value in discerning whether parolees are eligible for

relief under the IRAA. The present-perfect tense can appropriately refer to either (1) an action "completed at some indefinite time in the past," e.g., "I *have played* more than 1,000 rounds of golf," or (2) an action that "continues to the present," e.g., "I *have played* cards nonstop since 3:00 yesterday." Garner, *supra*, at 896; *see also Chicago Manual of Style* § 5.126, at 237 (16th ed. 2010) ("The present perfect tense . . . denotes an act, state, or condition that is now completed or continues up to the present.").

Due to the dual nature of the present-perfect tense, courts have repeatedly found the statutory use of the present-perfect tense ambiguous or to refer to both actions that continue into the present and actions that were completed at some point in the past. *See, e.g.*, *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 900 (Fed. Cir. 2023) ("Like the trade court, we hold that the distinction between 'has made' and 'has begun to make' is too narrow to rise to the level of a clear misconstruction.") (internal quotation omitted); *Bluewater Network v. E.P.A.*, 370 F.3d 1, 16 (D.C. Cir. 2004) ("The phrase 'has failed to attain'—stated in the present perfect tense—is ambiguous with regard to whether it applies to an area that failed to attain the NAAQS in the past but is currently attaining the standard."); *Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 940 (9th Cir. 2005) (per curiam) ("[W]e agree with [appellant] that use of the past present tense—'an alien shall be considered to have failed to maintain continuous presence' if the alien 'has departed'

from the United States for more than 90 days—is an insufficient ground from which to infer [congressional intent that the statute should apply retroactively].”); *Dobrova v. Holder*, 607 F.3d 297, 301-02 (2d Cir. 2010) (use of present-perfect phrase “has . . . been admitted” referred to both “aliens who were and still are admitted as [lawful permanent residents]” and also “to those who were at some earlier time admitted as [lawful permanent residents] but, as in the instant case, have had their [lawful permanent resident] status terminated”).

Indeed, the case on which the government primarily relies, *Padilla-Romero v. Holder*, 611 F.3d 1011 (9th Cir. 2010) (per curiam), undermines, rather than supports, its grammatical argument. In *Padilla-Romero*, the Ninth Circuit interpreted an immigration statute authorizing cancellation of removal for a noncitizen who “*has been* . . . lawfully admitted for permanent residence for not less than 5 years.” *Id.* at 1013 (emphasis added) (quoting 8 U.S.C. § 1229b(a)(1)). The court considered whether the phrase “has been” referred to “an event occurring at an indefinite past time (‘she has been to Rome’) or continuing to the present (‘she has been here for five hours’).” *Id.* The court concluded that the statute was “somewhat ambiguous” because, “[a]s a purely grammatical matter, the use of the present perfect tense ‘has been,’ read in isolation from the surrounding text of the statute, can connote” either of the two meanings above. *Id.* The court ultimately based its holding on language found elsewhere in the statute. *Id.* Our interpretation that the

use of the present-perfect tense in the IRAA is ambiguous thus aligns with these decisions. At best, whatever difference may exist between the present-perfect "has served" as used in the IRAA and the simple-past "served" is negligible in construing the statute as a whole. *See* Garner, *supra*, at 897 (confusion between the simple-past and present-perfect tense is "the most common error" associated with present-perfect tenses).

In its second textual argument, the government points to the language of several mandatory factors enumerated in Section 24-403.03(c) to support its position that the IRAA restricts eligibility to movants who are physically incarcerated. Under D.C. Code § 24–403.03(c)(6), for example, a trial court must consider "[a]ny statement, provided orally or in writing . . . by a victim of the offense for which the defendant *is imprisoned*" (emphasis added). Similarly, the IRAA instructs courts to consider "[w]hether the defendant has demonstrated maturity, rehabilitation, and a fitness to *reenter* society," *id.* § 24-403.03(c)(5) (emphasis added), and "[w]hether the defendant has substantially complied with the rules of the *institution* to which [the movant] *has been confined*," *id.* § 24-403.03(c)(3) (emphasis added). The government asserts that failure to account for this language "would be 'at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions.'" Gov. Br. at 18 (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

We acknowledge that some of the merits factors may imply that a movant must currently be incarcerated or do not make perfect grammatical sense as applied to a parolee. Nevertheless, in our view, these minor grammatical inconsistencies, although certainly relevant, offer diminished persuasive power in interpreting the statute's eligibility criteria for at least two reasons. First, merely because a class of litigants does not fit neatly into statutory language regarding the *merits* of a particular scheme does not mean that the class is not *eligible* for relief. *See West Virginia v. E.P.A.*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and *with a view to their place in the overall statutory scheme*.") (emphasis added) (internal quotation omitted). Second, the D.C. Council promulgated the core of the merits factors at a time when the IRAA explicitly barred IRAA relief to parole-eligible individuals (and, therefore, necessarily also to those released on parole). The current grammatical structure of the subsection (c) factors may merely reflect that now-outdated eligibility requirement.

Additionally, we believe that trial courts will have little difficulty in applying the merits factors to parolees. Despite a parolee's release from prison, the court can still assess whether the parolee "substantially complied" with the rules of the prison in which he or she was committed under factor (c)(3). D.C. Code § 24-403.03(c)(3). Similarly, the trial court can assess the movant's maturity and rehabilitation under

factor (c)(5). *Id.* § 24-403.03(c)(5). Indeed, the trial court may have *better* information regarding a movant's maturity, rehabilitation, and compliance with rules after their release on parole.

Nor is subsection (g) contrary to our reading of the statute. That subsection instructs courts to "*endeavor* to prioritize consideration of the applications of defendants who have been incarcerated the longest." *Id.* § 24-403.04(g) (emphasis added). This admonition is entirely consistent with our conclusion that the IRAA extends relief to movants who have been released from prison as well as those who remain incarcerated—courts must simply prioritize those that have been in prison the longest. More generally, however, a movant's conduct while incarcerated—even if later released on parole—remains an important component of the IRAA analysis.

We therefore hold that the IRAA does not require a movant to be incarcerated during the pendency of their motion so long as the movant has, at some point, served at least fifteen years in prison for the relevant sentence. Stated differently, the IRAA does not render otherwise eligible parolees ineligible for relief simply by virtue of their conditional release. Because the government does not contest that Mr. Long otherwise satisfies all other eligibility requirements, we turn to the merits of his motion.

**D.    The Merits**

**1.    Additional background**

*a.    The IRAA Hearing*

At the hearing on his motion, the government introduced as evidence Mr. Long's disciplinary history. Between 2002 and 2019, Mr. Long accrued a total of thirteen disciplinary infractions, two of which resulted in criminal charges. During his time in Bureau of Prisons custody between 2002 and 2014, Mr. Long incurred ten disciplinary infractions. Two of these infractions were 100-level infractions for disposing of an item during a search and possession of a hazardous tool in the form of a cellphone charging cable.[7] Mr. Long's eight other disciplinary infractions during this time were 200-level infractions, including three assaults, one threatening bodily harm, one fighting, one use of martial arts/boxing, and two cellphone infractions.

After returning to the D.C. Jail from Bureau of Prisons custody in 2018, Mr. Long incurred three infractions. Two of these infractions resulted in criminal charges. In October 2018, Mr. Long was in his cell speaking to a person on a

---

[7] The level of offense refers to its severity; offenses range from level 100, the most severe, to level 400, the least severe. *See* 28 C.F.R. § 541.3.

cellphone through earphones; Mr. Long was shielding himself from view of his cell door with a sheet. Correctional officers entered his cell. Surprised (he said) by the officers' entry and mistakenly believing them to be other prisoners posing a threat, Mr. Long punched one of correctional officers. Mr. Long testified that his impulsive response was due to exposure to trauma as a young person. In addition to receiving two disciplinary infractions for this incident, Mr. Long was criminally charged with one count of possessing contraband in the form of a cellphone and one count of assaulting a law enforcement officer. Mr. Long was separately disciplined for possession of a cellphone in 2019.

At the hearing, Mr. Long presented five witnesses, including himself. In his testimony, Mr. Long admitted for the first time that he shot and killed Mr. Williamson. Mr. Long, forty-four years old at the time of the hearing, came from a dysfunctional two-parent household. Throughout his childhood, Mr. Long suffered "neglect and physical abuse" from his father who "beat him persistently." At fourteen, Mr. Long began running away from home. Mr. Long started helping his uncle sell drugs. After his uncle was arrested and incarcerated, Mr. Long turned to selling drugs himself.

Dr. Lucy Guarnera testified as an expert in the administration of violence risk assessments. She administered two separate risk assessments to Mr. Long. In the

first, Dr. Guarnera found that five of ten historical risk factors applied to Mr. Long, but that he did not manifest any of the five "clinical risk factors." In the second assessment, Dr. Guarnera concluded that Mr. Long exhibited nine "protective factors" out of sixteen, which was "significantly higher" and more positive than other violent offenders. As to Mr. Long's disciplinary history, Dr. Guarnera concluded that Mr. Long's five cellphone infractions did not constitute "antisocial behavior" but acknowledged that Mr. Long showed a propensity toward rule-breaking, which meant that Mr. Long might "be likely to break technical conditions of probation." Overall, Dr. Guarnera found that Mr. Long presented "a low risk of violence."

Lieutenant Temesghen Andemichael, a correctional officer and Commander of the D.C. Department of Corrections' Young Men Emerging (YME) unit, selected Mr. Long as a mentor in the program "based on his observations of [Mr. Long's] interactions with other inmates and his leadership skills." Lieutenant Andemichael described Mr. Long as a "stand out guy" and stated that Mr. Long would be "an asset to the community when released."

Eric Weaver, a former inmate and program analyst in the YME unit, testified that phone abuse often arises out of "situation[s] where sometimes you got to think about, do you want to just not make outside contact, or do you run the risk of putting

yourself in a bad situation because of the phone or racing up getting up first thing in the morning trying to be the first one to get to the phone." Mr. Weaver had founded a nonprofit organization and testified that, if the opportunity presented, he would employ Mr. Long in a part-time position.

Finally, Professor Marc Howard—who directs the Prisons and Justice Initiative at Georgetown University—described Mr. Long as a leader in the classroom and a "model of academic engagement." Professor Howard offered Mr. Long a full time position as a program associate working in the reentry program earning $40,000 annually.

### b. The Trial Court Order

The trial court issued its written order on April 21, 2022. It found that Mr. Long was serving a term of thirty years to life and committed the underlying offense when he was eighteen years old. At the time of the order, Mr. Long had served twenty-six years of his sentence.

As to the first Section 24-403.03(c) factor, the trial court found that Mr. Long was eighteen years old at the time of the offense.

Under the second factor—the history and characteristics of the defendant— the court noted that the underlying crime was Mr. Long's first criminal offense.

Additionally, Mr. Long experienced violence during his youth, was physically and emotionally abused by his father, and participated in the drug trade as a juvenile. He obtained a GED from the Maryland Military Youth Corps.

The third factor requires the trial court to consider whether the movant "has substantially complied with the rules of the institution to which [the movant] has been confined, and whether the [the movant] has completed any educational, vocational, or other program, where available." D.C. Code § 24-403.03(c)(3). The trial court began by acknowledging Mr. Long's "extensive programming" spanning over 1,300 hours. These programs included courses in business, marketing, and computer skills. Mr. Long also helped create "Turning Life Sentences into a Life of Substance," a program "which helps inmates serving life sentences 'adopt a positive mindset and live a prosocial life.'" He has also trained to become an ESL tutor, helped fellow inmates obtain their GEDs, and served as a mentor in the YME unit.

On the other hand, the trial court found that Mr. Long's disciplinary record was "substantial." The court did not credit Mr. Long's explanation as to why he assaulted the correctional officer. It also noted that Mr. Long's repeated disciplinary infractions due to phone abuse "constituted calculated rule breaking to suit his own purposes, with an understanding of the consequences, and of the wrongfulness of the conduct." Overall, the court concluded that "without a more sustained period of

compliance," Mr. Long had "failed to demonstrate substantial compliance with institutional rules, notwithstanding the fact that [he] has not been disciplined since the 2019 infraction."

Under the fourth factor, which requires trial courts to consider "[a]ny report or recommendation received from the United States Attorney," the court noted the government's opposition to Mr. Long's motion.

On the fifth factor—concerning whether the movant has demonstrated maturity, rehabilitation, and fitness to reenter society—the trial court acknowledged Mr. Long's "sophisticated programming and educational enrichment" but was "concerned by [Mr. Long's] steady record of disciplinary infractions, which continued after participation in college courses early in his imprisonment, and other high-level programming." Mr. Long's "witnesses confirmed their strong support for" reducing his sentence. However, the trial court discounted some of their conclusions. For example, it was difficult for the trial court to "reconcile" Mr. Long's role as a YME mentor with "the example set by [Mr. Long's] recent violations of the rules of the institution." Finally, Mr. Long's "record of repeated disciplinary infractions, even after his return to the DC Jail, and even while pending sentencing for a new offense, [led] the court to conclude that [Mr. Long] ha[d] failed to meet his burden at [the] time."

Mr. Williamson's family did not provide a statement for the court to review under factor six.

The seventh factor instructs courts to consider examinations of the movant by medical professionals. According to Dr. Guarnera, Mr. Long's "past violent behavior, past antisocial behavior, association with negative peers, and violent attitudes were highly rooted in his adolescent and young adult contexts, contexts which no longer exist for him and seem highly unlikely to be recreated if he were released." Similarly, Shannon Keyes Woodward, a mitigation specialist who authored Mr. Long's Mitigation Report, concluded that Mr. Long "is a 'better educated, more mature, and goal driven man' than when he entered prison 26 years ago."

Under factor eight, courts must consider "[t]he defendant's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system." D.C. Code § 24-403.03(c)(8). The trial court concluded that Mr. Long's "family and community circumstances [at the time of the motion were] not particularly favorable. He has long been estranged from his family despite his attachment to his grandmother and his improving relationship with his mother. [Mr. Long's] community resources are dependent on the success of interventions by reentry specialists and others whom he has worked

with or associated with while incarcerated." Overall, "[w]hile these are important to his reentry," the court concluded that "the absence of family and community support is notable."

As to factor nine, the trial court noted that Mr. Long "was the primary actor in the shooting death of [Mr.] Williamson, although the offense arose from a dispute that involved one or more additional individuals."

Finally, under factor ten, the trial court stated that it had "considered" "the diminished culpability of juveniles as compared to that of adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime[.]"[8]

The trial court made no express findings as to Mr. Long's dangerousness "to the safety of any person or the community" or whether the "interests of justice warrant a sentence modification." D.C. Code § 24-403.03(b)(2). In its concluding paragraph, the court stated: "On consideration of the record as a whole, including

---

[8] The D.C. Council added language to factor ten in a 2021 amendment. *See* Omnibus Public Safety and Justice Amendment Act of 2020, D.C. Law 23-724, § 601, 68 D.C. Reg. 001034 (Apr. 27, 2021). The trial court, however, appears to have mistakenly conducted its analysis under the pre-amendment version of the statute, which omitted this language. Because Mr. Long does not argue that this constituted an abuse of discretion, we do not consider the question.

[Mr. Long's] 2018 and 2019 arrest and infractions, his overall disciplinary history, and the concerns about his release plan, the court finds that [Mr. Long] has not met his burden under the IRAA." The court noted that it was "aware that [Mr. Long] has been granted parole effective July 29, 2022" and "will be released pursuant to the protocols of the parole process." It found "that these protocols are necessary to ensure [Mr. Long's] transition in a way that minimizes the risks the court has identified."

## 2. Standard of Review

We review the denial of an IRAA motion for abuse of discretion. *Bishop*, 310 A.3d at 641. Under this standard, we owe "broad deference to [the] ruling by the trial court." *Walden v. United States*, 366 A.2d 1075, 1076-77 (D.C. 1976). In reviewing for abuse of discretion, we "must determine whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (internal quotation omitted). "A court by definition abuses its discretion when it makes an error of law." *Vining v. District of Columbia*, 198 A.3d 738, 754 (D.C. 2018) (internal quotation omitted).

Mr. Long argues that the trial court abused its discretion in two ways: (1) it committed legal errors and (2) it improperly weighed certain pieces of evidence.

### 3. Discussion

*a. Legal Error*

With respect to asserted legal errors, Mr. Long argues that (1) the trial court made no express findings as to whether he posed a "danger to the safety of any person or the community" or whether "the interests of justice warrant a sentence modification" as required by the statute, D.C. Code § 24-403.03(a)(2); and (2) the trial court misapplied factor eight because that factor is concerned with Mr. Long's family and community circumstances at the time of the underlying offense, not the time of the motion.

We agree with Mr. Long that the trial court committed legal error. In particular, the trial court made no express findings on either of the determinative inquiries under the IRAA. As noted above, the trial court must reduce a term of imprisonment if the movant "is not a danger to the safety of any person or the community and the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a)(2). Only if a movant satisfies both of these elements "shall" the court reduce the term of imprisonment. *Id.* § 24-403.03(a). Conversely, if the movant fails to satisfy either of the two elements, the trial court must deny his or her motion. As to these determinative inquiries, the trial court here stated in full that "[o]n consideration of the record as a whole, including defendant's 2018 and 2019 arrests

and infractions, his overall disciplinary history, and the concerns about his release plan, the court finds that defendant has not met his burden under the IRAA."

The trial court's explanation does not specify whether it denied Mr. Long's motion because it found Mr. Long dangerous or because the interests of justice weigh against a reduced sentence. Although its concluding passage makes certain findings, we are unable to discern whether the court concluded that Mr. Long had not "met his burden" with respect to dangerousness, the interests of justice, or both. Without the trial court's express view on either of these inquiries (and the reasons supporting its view), we cannot determine whether its rationale for denying the motion is sufficient. *See Bishop*, 310 A.3d at 637 ("[T]o ensure this court's ability to adequately review its decision, the trial court must make clear in [its] written opinion how the statutory factors informed its determinations regarding dangerousness and the interests of justice."). A trial court's failure to explain such a nonobvious exercise of discretion generally requires a remand, particularly when it prevents adequate appellate review of the basis of its holding.[9] *See Sherman v. Quinn*, 668 F.3d 421, 425 (2d Cir. 2012) ("Ordinarily, when a district judge fails to

---

[9] Of course, the trial court need not "mechanically tick off each piece of evidence" supporting its dangerousness and/or interests of justice analysis or follow any particular formula in presenting its core holding. *Bishop*, 310 A.3d at 642. As pertinent here, it need only identify whether it concluded that the movant was dangerous, that the interests of justice weighed against a sentence reduction, or both, and provide the essential reasons for its conclusion(s).

explain a nonobvious exercise of his [or her] discretion, the proper remedy is to remand the case for him [or her] to do so." (internal quotation omitted)). "[A]lthough we accord the trial court substantial 'latitude' in its exercise of discretion, this latitude comes with conditions: that the 'court . . . take no shortcuts,' that it 'exercise its discretion with reference to all the necessary criteria,' and that it explain its reasoning in sufficient detail to permit appellate review." *Cruz v. United States*, 165 A.3d 290, 294 (D.C. 2017) (emphasis omitted) (quoting *Ibn-Tamas v. United States*, 407 A.2d 626, 635 (D.C. 1979)). In addition, the lack of any indication whether the trial court relied on dangerousness, the interests of justice, or both, prevents this court from conducting a meaningful harmlessness analysis if it were to determine that the bases for one ground or the other were erroneous.

As to Mr. Long's second claim of legal error—that the trial court misinterpreted and misapplied factor eight—we conclude that the trial court erred. The eighth factor requires the trial court to consider "[t]he defendant's family and community circumstances *at the time of the offense*, including any history of abuse, trauma, or involvement in the child welfare system." D.C. Code § 24-403.03(c)(8) (emphasis added). The trial court, however, only considered Mr. Long's family and community circumstances at the time of his motion. *See* Order at 19 ("*At this time*, defendant's family and community circumstances are not particularly favorable.") (emphasis added). It therefore failed to account for Mr. Long's unstable home life,

exposure to violence, or involvement with drug dealing as circumstances contributing to the underlying offense under factor eight. "A court by definition abuses its discretion when it makes an error of law." *Vining v. District of Columbia*, 198 A.3d 738, 745 (D.C. 2018) (internal quotations omitted).

The government acknowledges this error but argues that Mr. Long suffered no prejudice by the trial court's mere "transposition error" because the court took into account his family and community circumstances at the time of the offense elsewhere in its order. Indeed, under factor two, the trial court discussed Mr. Long's history of family abuse and trauma and the influence that "the gun and drug epidemic in the 1980s and 1990s" had "on his childhood and resulting behavior," including by selling drugs on behalf of his uncle. Moreover, although factor eight does not call for consideration of the defendant's family and community circumstances at the time of the IRAA motion, we see no reason that such circumstances would not be relevant for (unfavorable or favorable) consideration under factor eleven. In any event, in light of our other finding of legal error and remand on that basis, we need not determine whether Mr. Long was prejudiced by the trial court's error with respect to factor eight.

### b. *Improper Weighing*

Mr. Long also asserts that the trial court gave "improper weight" to certain pieces of evidence. First, he contends that the court placed "far more emphasis on the 2018 and 2019" disciplinary incidents than was warranted. Second, Mr. Long argues that the trial court overly relied on his "lack of support from his family." Finally, Mr. Long asserts that the trial court placed undue weight on his several cellphone infractions.

We disagree with Mr. Long that the trial court improperly weighed certain aspects of the case. Generally, on review for abuse of discretion, an argument that the trial court "should have given more weight to factors favorable to [the appellee] . . . is not a basis for reversal." *Sharps v. United States*, 246 A.3d 1141, 1159 n.90 (D.C. 2021). "[S]o long as the evidence provides sufficient support for the trial court's order, we will not substitute our judgment . . . for that of the judge who heard the evidence." *Blackson v. United States*, 897 A.2d 187, 194 (D.C. 2006) (internal quotation and brackets omitted); *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 513 (D.C. 2020) ("Discretion signifies choice.") (internal quotations omitted). Although it is difficult to discern how the court ultimately weighed each factor without any findings under Section 24-403.03(a)(2), we see no error in the weight it appeared to ascribe to any of the evidence.

First, regarding the trial court's assessment of the 2019 infraction, Mr. Long argues that it "was the only infraction involving a prison employee during [Mr.] Long's entire decades-long incarceration" and that he had adequately explained the event. While the former may be true, Mr. Long also correctly recognizes that "[p]unching a guard is certainly not inconsequential." The trial court was within its discretion to decline to credit Mr. Long's explanation of the event. *See Bolanos v. United States*, 938 A.2d 672, 685 (D.C. 2007) ("It is the role of the trial court to assess the credibility of witnesses . . . ."). True, Mr. Long's most recent violent disciplinary offense aside from the 2019 infraction occurred in 2007, nearly two decades ago. The trial court, however, wished to see "a more sustained period of compliance" after the 2019 incident. In our view, the trial court did not exceed its discretion in this respect.

Second, Mr. Long asserts that "the trial court's heavy emphasis on [his] supposed lack of support from family is entirely inappropriate" because "[m]any defendants serving lengthy prison sentences come from dysfunctional families that, for reasons beyond [their] control . . . cannot be expected to support them." We agree that the IRAA is "not mean[t] to exclude" individuals who do not maintain familial ties, especially when they come from circumstances where those ties may have contributed to the underlying crime. Indeed, courts should credit movants who extricate themselves from the violent or unstable circumstances of their youth. Here,

however, the trial court noted Mr. Long's familial circumstances (outside of its discussion in factor eight) only in the context of his ability to provide "for stable housing after one year." On remand, the trial court may well give Mr. Long credit for removing himself from the circumstances that contributed to the underlying offense. Nevertheless, the trial court did not abuse its discretion in discounting Mr. Long's reentry plan based on what it ultimately concluded was a deficiency in his plans for housing.[10]

Finally, Mr. Long argues that the trial court placed undue weight on his cellphone infractions. We do not agree. Again, we afford a trial court considerable deference in weighing evidence. Mr. Long does not contest that he sustained many disciplinary infractions based on phone-use rules over a period of several years. On this basis, the trial court "conclude[d] that, without a more sustained period of compliance," factor three would not weigh in favor of Mr. Long. We cannot say that the trial court abused its discretion in this respect.

---

[10] Mr. Long appears to separately argue that a movant's familial circumstances are never a proper factor of a trial court to consider. Mr. Long raised this argument for the first time in his reply brief. Accordingly, we do not address it. *See Cummings v. D.C. Dep't of Motor Vehicles*, 294 A.3d 121, 128 (D.C. 2023) ("We generally will not consider arguments raised for the first time in a reply brief.").

### III.  Conclusion

We conclude that a remand is necessary for the trial court to reconsider its order in light of the foregoing discussion.  Accordingly, we vacate the trial court's order and remand the matter for further proceedings consistent with this opinion.

*So ordered.*